# United States Court of Appeals for the Federal Circuit

2008-1354

GRANT COUNTY BLACK SANDS IRRIGATION DISTRICT (GCBSID)
and WILLIAMSON LAND COMPANY,

Plaintiffs-Appellants,

v.

UNITED STATES, BUREAU OF RECLAMATION,
KEN SALAZAR, Secretary of the Interior,
ROBERT W. JOHNSON, in his capacity as Commissioner of the Bureau of
Reclamation, J. WILLIAM MCDONALD, in his individual capacity,
and J. WILLIAM MCDONALD, in his capacity as Regional Director of the Pacific
Northwest Region of the Bureau of Reclamation,

Defendants-Appellees.

Ronald Ady, Christensen Law Group, L.P., of Salt Lake City, Utah, argued for plaintiffs-appellants. With him on the brief was Ronald K. Christensen.

Allen M. Brabender, Trial Attorney, Environment and Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendants-appellees. With him on the brief was Ronald J. Tenpas, Assistant Attorney General.

Appealed from: United States District Court for the Eastern District of Washington

Chief Judge Robert H. Whaley

# United States Court of Appeals for the Federal Circuit

2008-1354

GRANT COUNTY BLACK SANDS IRRIGATION DISTRICT (GCBSID)
and WILLIAMSON LAND COMPANY,

Plaintiffs-Appellants,

v.

UNITED STATES BUREAU OF RECLAMATION,
KEN SALAZAR, Secretary of the Interior,
ROBERT W. JOHNSON, in his capacity as Commissioner of the Bureau of
Reclamation, J. WILLIAM MCDONALD, in his individual capacity,
and J. WILLIAM MCDONALD,  in his capacity as Regional Director of the Pacific
Northwest Region of the Bureau of Reclamation,

Defendants-Appellees.

Appeal from the United States District Court for the Eastern District of Washington
in case no. 06-CV-204, Chief Judge Robert H. Whaley.

_____

DECIDED:  September 2, 2009

_____

Before SCHALL, BRYSON, and LINN, <u>Circuit Judges</u>.

BRYSON, <u>Circuit Judge</u>.

I

In 1937, Congress authorized a multipurpose reclamation project known as the Columbia Basin project, which was designed to irrigate farmland in central Washington with water drawn from the Columbia River.  Over time, water that seeped into the ground from the surface irrigation created significant quantities of artificially stored

groundwater in the Quincy Basin area. The Washington Department of Ecology began managing the Quincy Basin groundwater in 1973 but later accepted the federal government's claim to ownership of that water. See Flint v. United States, 906 F.2d 471, 473–74 (9th Cir. 1990); Jensen v. Wash. Dep't of Ecology, 685 P.2d 1068, 1070 (Wash. 1984). The Bureau of Reclamation, an agency within the United States Department of the Interior, subsequently issued a standard form contract authorizing private landowners to use the Quincy groundwater. The contracts were executed under the authority of section 9(e) of the Reclamation Project Act of 1939 ("the 1939 Act"), Pub. L. No. 76-260, 53 Stat. 1187, codified at 43 U.S.C. § 485h(e). Since 1975, the withdrawal of Quincy groundwater by private landowners has been conditioned on the execution of the Bureau's section 9(e) contract and on the receipt of a state permit from the Washington Department of Ecology.

There are currently 292 landowners in the Quincy Basin that have entered into a water supply agreement with the Bureau of Reclamation. They include the Williamson Land Company ("Williamson") and the members of the Grant County Black Sands Irrigation District ("GCBSID"). In consideration for a "license to withdraw and use its artificially stored ground water," the Bureau charges the landowners an annual "[p]ayment for water" consisting of a variable charge for operation and maintenance, and a fixed charge of $1.70 per acre "for participation in Project construction repayment." The Bureau's standard form contract also states that the license "shall continue for a period of 10 years" and "shall be extended . . . for an additional like period without further notice provided the State permit . . . has been extended for a similar period."

Initially, the Washington state permits issued to the Quincy groundwater users had 10-year terms. In 1983, the Washington Department of Ecology eliminated the 10-year term limitation. The state permits are now automatically renewed subject only to the Department's authority to modify or terminate the permits "at any time for good cause." Wash. Admin. Code 173-134A-080(2)(i) (2009); see also Wash. Rev. Code. § 90.40.100 (2009). While the landowners' contracts with the Bureau have been renewed several times, the material terms and provisions of the current contracts are identical in all respects to the standard form water service contract promulgated by the Bureau in 1975.

In July 2006, the appellants brought this suit as a class action in the United States District Court for the Eastern District of Washington. The action was brought on behalf of all landowners located within the GCBSID that hold water service contracts for the withdrawal of Quincy groundwater. The complaint sought injunctive and monetary relief against the Bureau of Reclamation. The appellants' theory of the case was that they were entitled to the statutory benefits accorded to holders of "repayment contracts" and "long-term water service contracts" under reclamation law. The appellants filed two motions for partial summary judgment, and the government filed a motion to dismiss the complaint for lack of subject matter jurisdiction or, in the alternative, to render judgment on the pleadings.

The district court rejected the appellants' statutory theory and dismissed the complaint. The court canvassed the statutory provisions cited in the parties' briefs and concluded that the contracts at issue are "short-term water service contracts," not "repayment contracts" or "long-term water service contracts," and that the appellants are

not entitled to the same statutory benefits accorded to holders of the latter two types of contracts. The court denied the appellants' motions for summary judgment as moot. Grant County Black Sands Irrigation Dist. v. United States, 539 F. Supp. 2d 1292, 1298–99 (E.D. Wash. 2008).[1] The appellants then took this appeal.

## II

At the outset, the parties disagree about whether this court has jurisdiction over the appeal. The appellants argue that their claim for $10,000 in damages constituted a claim under the "Little Tucker Act," 28 U.S.C. § 1346(a)(2). Because the jurisdiction of the district court was based in part on that Act, the appellants submit that this court has appellate jurisdiction under 28 U.S.C. § 1295(a)(2). The government responds that in substance this is an appeal from the denial of a request for equitable relief and that the jurisdiction of the district court was invoked under the Administrative Procedure Act

---

[1] Although the district court's analysis is largely directed at demonstrating why the appellants' claims fail on the merits, the court at one point stated that because the plaintiffs had "failed to establish a claim under the APA, they are not entitled to an APA waiver of sovereign immunity." Based on that language in the district court's order, the government argues that the court dismissed the complaint for want of jurisdiction. In fact, the court's order is more properly characterized as a dismissal on the merits. The complaint set forth statute-based claims that, if accepted, would have justified relief either in the form of damages or an order affecting the parties' rights under their contracts, or both. That was sufficient to confer jurisdiction on the district court. See Jackson Transit Auth. v. Local Div. 1285, Amalgamated Transit Union, 457 U.S. 15, 21 n.6 (1982); Bell v. Hood, 327 U.S. 678, 680–81 (1946). The government's argument that the district court had no jurisdiction under the APA focuses on the merits of the appellants' statutory claims and is predicated on the erroneous notion that a court does not have jurisdiction to address a claim that is incorrect on the merits. Accordingly, to the extent that it may be pertinent in any future proceedings, we treat the dismissal as having been on the merits rather than on jurisdictional grounds. See Lewis v. United States, 70 F.3d 597, 604 (Fed. Cir. 1995).

("APA"), 5 U.S.C. §§ 701 et seq., not the Little Tucker Act. For that reason, the government contends, appellate jurisdiction lies in the Ninth Circuit, not in this court.

It is certainly true that much of the relief sought by the appellants was equitable in nature. However, this court has jurisdiction over an appeal as long as the jurisdiction of the district court was based "in whole or in part" on the Little Tucker Act. Wopsock v. Natchees, 454 F.3d 1327, 1331 (Fed. Cir. 2006). The question for us is not whether the main thrust of the action in the district court was equitable, but whether the district court's jurisdiction was based, even in part, on section 1346(a)(2). The complaint listed the Little Tucker Act as one of the bases for the district court's jurisdiction and sought "specific monetary relief for illegal overcharges imposed on them by the Bureau of Reclamation." We therefore focus on the appellants' allegations with respect to the water use charges assessed by the Bureau of Reclamation.

The appellants' theory of the case proceeded from the premise that the contracts of the landowners they represent are not contracts to purchase water, but contracts to repay the federal government for their share of the construction costs of the irrigation projects. Both in the complaint and in various pleadings before the district court, the appellants cited a number of statutory provisions and court decisions as support for the proposition that any administrative overcharges assessed by the Bureau of Reclamation must be credited toward that repayment obligation or be refunded to the landowners. The complaint alleged that the Bureau of Reclamation had overcharged the landowners for the operation and maintenance of the irrigation works and that if those excess charges had been properly credited to repayment, the landowners' contractual payment obligations would have ended several years ago. The "monetary relief" sought by the

appellants was a refund of the alleged overcharges for operation and maintenance, or alternatively a credit in the amount of the alleged excess charges toward the landowners' repayment obligation. In that regard, the prayer for relief included a request for judgment that the landowners are entitled to "receive an aggregate total sum of $10,000 in damages against the United States for the . . . advance collection of administrative charges for administration of the Quincy Ground Water Subarea Artificially Stored Ground Water Program from the Plaintiff class."[2]

That theory of relief in effect seeks damages for an unlawful exaction. See United States v. Testan, 424 U.S. 392, 401–02 (1976); Norman v. United States, 429 F.3d 1081, 1095 (Fed. Cir. 2005); Telecare Corp. v. Leavitt, 409 F.3d 1345, 1348 (Fed. Cir. 2005); Aerolineas Argentinas v. United States, 77 F.3d 1564, 1582–73 (Fed. Cir. 1996). Under that theory, the trial court had Little Tucker Act jurisdiction because if the appellants' theory of the case were accepted on the merits, the relief to which the landowners would be entitled would include up to $10,000 in damages by way of a refund of previous administrative overcharges. See, e.g., Brazos Elec. Power Co-op., Inc. v. United States, 144 F.3d 784, 787 (Fed. Cir. 1998) ("Whether this refund is paid directly . . . or whether it is credited towards other money . . . owe[d] to the federal government is irrelevant to our analysis.").

---

[2] One of the statutory benefits claimed by the appellants was the right to operate and manage the irrigation works through a water users' association or an irrigation district, such as the GCBSID. See, e.g., 43 U.S.C. §§ 498–501. Thus, the complaint further specified that the $10,000 award shall be "in the form of payment to GCBSID . . . in the year in which the GCBSID takes over the administration and management of the program."

Notwithstanding the reference to the Little Tucker Act in the complaint, the government argues that the appellants waived that claim. It is true, as the government contends, that the appellants' response to the government's motion to dismiss in the district court contained no express reference to the Little Tucker Act. But because the district court's jurisdiction could readily be sustained on other grounds, such as the APA, it is not surprising that the appellants focused their attention on those other grounds for opposing the motion to dismiss. In an effort to preserve their APA claim before the district court, the appellants argued that the limitations on equitable remedies under the Tucker Act precluded complete and adequate relief in the Court of Federal Claims. See, e.g., Nat'l Ctr. for Mfg. Scis. v. United States, 114 F.3d 196, 200–02 (Fed. Cir. 1997). By emphasizing the equitable relief sought in the complaint, however, the appellants did not waive their claim to a refund under the Little Tucker Act. They made clear that even if the district court were to dismiss the APA claim, the action would survive "at least as to that part of the Plaintiffs' claims which seeks refund of overcollections assessed against them by BOR." Moreover, the appellants' filings in the district court further demonstrate that they did not abandon their Little Tucker Act claim; in a pleading filed pursuant to the district court's scheduling order, the appellants asserted that they "have made a Little Tucker Act Claim," citing the paragraph in the complaint seeking $10,000 in damages for administrative overcharges that they claim the landowners should not have had to pay. Because the jurisdiction of the district court was based at least in part on the Little Tucker Act and because the appellants did not waive their Little Tucker Act claim in the district court, we have jurisdiction over this appeal.

III

On the merits, the central issue in this appeal is whether the Secretary of the Interior committed legal error in denying the appellants the statutory benefits that are accorded to holders of "repayment contracts" and "long-term" water service contracts. The appellants present three grounds for compelling the Secretary to grant them those benefits: (1) their contracts are "long-term" water service contracts, within the meaning of section 9(e) of the 1939 Act, and they are entitled to the statutory benefits accorded to holders of such contracts; (2) their contracts are "repayment contracts," as defined in section 2(e) of the 1939 Act, 43 U.S.C. § 485a(e), and they are entitled to the statutory benefits accorded to holders of such contracts; and (3) the Secretary, acting through the Bureau of Reclamation, has already granted the appellants the benefits due to holders of repayment and long-term water service contracts, and cannot now revoke those benefits. Before we address the merits of those arguments, we briefly review the general principles of reclamation law and the different types of contracts for the delivery of project water.

Modern reclamation law has its roots in the Reclamation Act of 1902, Pub. L. No. 57-161, 32 Stat. 388, as amended, 43 U.S.C. §§ 371 et seq., which laid the groundwork for a vast and ambitious federal program to irrigate the arid lands of the western states. Under the 1902 Act, the Secretary of the Interior was charged with building dams, canals, and other irrigation facilities to be financed through the sale of federally owned lands. 43 U.S.C. §§ 391, 411. It was expected that the owners of the newly irrigated lands would repay their share of the construction costs of the reclamation projects over a 10-year period. Reclamation Act of 1902, § 4, 32 Stat. 388, 389 (current version at 43

U.S.C. §§ 419, 461).  The operation and maintenance costs of the projects, however, were to be the responsibility of the federal government until such time as the construction payments had been made for the major portion of the lands irrigated by the projects, at which point the management and operation of the projects would pass to the landowners.  43 U.S.C. § 498.

It soon became clear that the landowners' repayment obligations far exceeded their ability to pay.  Congress therefore extended the repayment period to 20 years in 1914 and to 40 years in 1926.  43 U.S.C. §§ 423e, 475; see S.T. Harding, Background of California Water & Power Problems, 38 Cal. L. Rev. 547, 557 (1950).  In light of the repayment extensions, Congress required the landowners to reimburse the federal government for their share of the annual operation and maintenance costs of the projects.  43 U.S.C. §§ 492, 493.  The Secretary of the Interior, however, was granted discretionary authority to transfer the operation and maintenance of all or any part of the irrigation project works to a water users' association or an irrigation district.  Id. § 499.

In the wake of the Great Depression, as landowners became increasingly unable to meet their repayment obligations, Congress enacted the Reclamation Project Act of 1939.  The goal of the 1939 legislation was to restructure the landowners' repayment obligations on the basis of ability to pay, while still protecting the federal government's financial investment in the reclamation projects.  See 43 U.S.C. § 485.  To that end, the 1939 Act addressed the Secretary's contracting authority in two respects that are of particular relevance to this appeal.

First, in section 9(d) of the 1939 Act Congress authorized the Secretary of the Interior to enter into the classic repayment-type contract contemplated by the 1902 Act.

Such contracts, typically called "9(d) contracts," were made available only to irrigation districts, water users' associations, and other organizations "satisfactory in form and powers to the Secretary." 43 U.S.C. § 485h(d). Under a 9(d) contract, the organization would receive project water in exchange for assuming a "general repayment obligation," which had to be repaid "over a period of not more than 40 years." Id. § 485h(d)(3). The repayment obligation was defined in the 1939 Act as that "part of the construction costs allocated by the Secretary" to the organization. Id. § 485h(d)(2). Thus, the 9(d) contract was in form and substance a straightforward application of the repayment principle that governed reclamation law prior to the 1939 Act.

Second, in section 9(e) of the 1939 Act Congress created a new source of contracting authority for the Secretary, known as a "9(e) contract." Section 9(e) provided that, "[i]n lieu of entering into a repayment contract pursuant to the provisions of subsection (d)," the Secretary had discretion to enter into "either short- or long-term contracts to furnish water for irrigation purposes." The water supplied under 9(e) contracts was supposed to be provided "at such rates as in the Secretary's judgment will produce revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost and an appropriate share of such fixed charges as the Secretary deems proper." Although 9(e) contracts were described as either "short-term" or "long-term," the 1939 Act did not define those terms or indicate that any legal consequences would turn on the "short-term/long-term" distinction. 43 U.S.C. § 485h(e).

The principal difference between 9(d) and 9(e) contracts under the 1939 Act was that under a 9(d) contract, the irrigation district or water users' association assumed an

obligation to repay the construction costs of the project works in fixed annual installments over a predetermined period of time. By contrast, a 9(e) contract was merely a contract to receive project water at an annual rate set by the Secretary. The 9(e) contract was also more limited in its application than a 9(d) contract, because the Secretary was statutorily prohibited from using a 9(e) contract to charge landowners for the fixed costs of "irrigation water distribution works," such as canals and laterals. See Alfred R. Golze, Reclamation in the United States 107 (1961) (section 9(e) applies to "water supply works," such as dams and reservoirs); Arthur A. Maass, Administering the CVP, 38 Cal. L. Rev. 666, 672 (1950); Bureau of Reclamation, Dep't of the Interior, Repayment of Reclamation Projects xiii, xli, xlii (1972); see also Ivanhoe Irrigation Dist. v. McCracken, 357 U.S. 275, 286–87 (1958).

The legislative history of the 1939 Act does not provide a clear account of Congress's reasons for authorizing the Secretary of the Interior to enter into 9(e) contracts. Although the committee reports on the 1939 Act indicate that Congress was generally focused on "introducing flexibility into the contracts under which water users repay to the Government the cost of construction of Federal reclamation projects," there is little by way of explanation for why Congress thought section 9(e) was necessary to accomplish that goal. H.R. Rep. No. 76-995, at 1 (1939); S. Rep. No. 76-758, at 1 (1939). The 1939 Act was based in part on the findings of a special commission charged with studying the factors and conditions affecting the repayment of construction charges. See H.R. Rep. No. 76-995, at 2 (1939). One of the commission's recommendations was that "water should be delivered on a rental basis" to certain specified projects for which the landowners were unable to pay even the operation and

maintenance costs. H.R. Doc. No. 75-673, at 20, 38 (1938). It may be that Congress decided to adopt the commission's recommendation for a broad class of reclamation projects, such as dams, reservoirs, and other large-scale works for which the landowners could not be expected to repay the construction costs.

In part, section 9(e) codified the Bureau of Reclamation's pre-existing practice of taking a "water rental" approach when the total costs of the project could not be determined until after the project had been completed. See Harry P. Glassman, The Validity of the 9(e) Contract, 38 Cal. L. Rev. 739, 741 n.9 (1950); see also H.R. Doc. No. 75-673, at 11 (1938). Several commentators suggested, however, that the introduction of 9(e) contracts constituted a departure from the repayment model insofar as the new contracts permitted the federal government to take on the role of a public utility, rather than a contractor of last resort for reclamation projects. See Harding, supra, at 569 ("Under the 9e contract the Bureau of Reclamation becomes a public utility selling service instead of a construction agency selling constructed projects to their users."); Roy E. Huffman, Irrigation Development & Public Water Policy 93 (1953) ("This type of contract places the Bureau of Reclamation very much in the category of a public utility."); Maass, supra, at 671 (holders of 9(e) contracts essentially "purchase a utility service in the same sense that a citizen anywhere purchases electric power at an agreed rate"); see also S.V. Ciriacy-Wantrup, Natural Resource Economics 189–192 (1985); Glassman, supra, at 739–45; Water Res. Policy Comm'n, Ten Rivers in America's Future 248–49 (1950).

Whatever the reasons for Congress's decision to authorize 9(e) contracts, the Bureau of Reclamation soon began entering into 9(e) contracts in connection with a

number of existing and newly constructed reclamation projects. Irrigation districts and landowners, particularly in the San Joaquin Valley of California, vigorously contested the use of such utility-type contracts, arguing that the Bureau of Reclamation was not authorized to enter into water rental contracts. See Sheridan Downey, They Would Rule the Valley 243 (1947). The Bureau of Reclamation also encountered considerable resistance to its standard form water rental contracts, which did not guarantee any permanent water rights or grant any credit toward repayment of the construction costs of the project. See Ciriacy-Wantrup, supra, at 189–192; Downey, supra, at 226–29, 243–46; Huffman, supra, at 93; Raymond Moley, What Price Federal Reclamation? 20–22 (1955); Robert de Roos, The Thirsty Land 154–58 (1948).

In 1956, Congress took up the landowners' cause and supplemented sections 9(d) and 9(e) of the 1939 Act. See Pub. L. No. 84-643, 70 Stat. 483 (1956) (codified at 43 U.S.C. §§ 485h-1 to 485h-6). It did so principally by conferring new benefits on holders of "long-term" 9(e) contracts, which were defined as 9(e) contracts having a term of more than 10 years. 43 U.S.C. § 485h-3. Those benefits included (1) the right to renew the contract on "terms and conditions mutually agreeable to the parties," (2) the right to convert the contract into "a contract under [section 9(d)]," and (3) the right to cease paying the "construction component" of the total use charge when the payments in excess of the government's operation and maintenance charges equaled the construction cost of the project. Id. § 485h-1. Thus, although the "short-term/long-term" distinction predated the 1956 legislation, Congress for the first time added meaning to that distinction. Significantly, the 1956 Act contained no reference to extending benefits

to short-term 9(e) contracts similar to those that were extended to long-term 9(e) contracts.

As the committee reports on the 1956 Act make clear, the purpose of the legislation was to address the landowners' concerns

> (1) that no assurance can be given in the contract itself or in any other document binding upon the Government that the contract will be renewed upon its expiration; (2) that the water users who have this type of contract are not assured that they will be relieved of payment of construction charges after the Government has recovered its entire irrigation investment; and (3) that the water users are not assured of a "permanent right" to the use of water under this type of contract.

S. Rep. No. 84-2241, at 2 (1956); H.R. Rep. No. 84-1754, at 2 (1956); see also Ivanhoe, 357 U.S. at 297–98 (the 1956 Act "answered most of the objections lodged against" the requirements of section 9(e) of the 1939 Act).  It was equally clear, however, that Congress did not intend for the 1956 legislation to repudiate the Bureau of Reclamation's general view that the "so-called water service or utility type contracts as authorized by the Reclamation Project Act of 1939 represented an innovation in reclamation law."  S. Rep. No. 84-2241, at 2 (1956).  The 1956 Act merely made it "possible for the Secretary of the Interior in approving so-called 'water service' and 'utility type' contracts to meet objections" of the landowners with respect to renewability, crediting, and permanent water rights.  Id.  Thus, 9(e) contracts continued to be treated as "water service" or "utility-type" contracts, distinct from 9(d) contracts and the repayment-type contracts envisioned by the 1902 Act.  See 4 Robert E. Beck, Water & Water Rights 39-58 n.245, 39-59 n.247 (1991) ("Contracts under § 9e are not really repayment contracts, but rather water supply contracts that may take into consideration project costs, but do not purport to collect full payment in any set period of time"); Frank

J. Trelease & George A. Gould, Cases & Materials on Water Law 697 (4th ed. 1986) (section 9(e) contracts have been "likened to the arrangement made by a public utility furnishing water to consumers"); see also Reed D. Benson, Whose Water Is It? Private Rights and Public Authority Over Reclamation Project Water, 16 Va. Envtl. L.J. 363, 371 (1997) ("The repayment contract is analogous to a mortgage, while a water service contract is more like a lease."); Golze, supra, at 247, 256. With that historical and statutory context in mind, we turn to the appellants' challenges to the government's position with respect to their contract rights.

IV

We begin by addressing the narrowest of the appellants' grounds for relief, namely that the contracts at issue are long-term contracts under section 9(e) of the 1939 Act, 43 U.S.C. § 485h(e). The appellants assert that if we were to accept their characterization of the contracts as long-term contracts, they would be entitled to the renewal, conversion, and repayment credit rights set forth in the 1956 Act and codified at 43 U.S.C. § 485h-1.

As noted, a long-term contract is defined as any contract to furnish water "the term of which is more than ten years." 43 U.S.C. § 485h-3. Article 6 of the landowners' contracts states, in pertinent part:

> TERM. This license shall be effective on the date hereof and . . . shall continue for a period of 10 years, or until the termination date of the Landowner's State permit if it is earlier, and shall be extended . . . for an additional like period without further notice provided the State permit referred to in Article 3 has been extended for a similar period with a new termination date therefor . . . .

During the initial 10-year term of their contracts, the landowners were required to pay only a percentage of the annual water user charge calculated by the Bureau of

Reclamation.  With respect to the amounts due after the initial 10-year term, the contracts state that "[r]enewals will be billed at 100 percent."  Because the contracts "continue for a period of 10 years," albeit with the possibility of renewal, they are not, on their face, "long-term" contracts as that term is defined in section 485h-3.

A

The appellants make two arguments as to why their contracts are "contracts for more than ten years" despite the explicit 10-year term set forth in Article 6.  First, they argue that the contracts are permanent and uninterruptible because the underlying state permits do not expire after a term of years.  While the appellants acknowledge that the state permits may be terminated for good cause by the Washington Department of Ecology, they contend that Congress has preempted the field of reclamation law and that the state of Washington is therefore required to exercise its authority to terminate the permits in conformity with federal law.  Under the appellants' theory, the good cause requirement for terminating the appellants' state permits is essentially a nullity—the circumstances justifying the termination of the permits are the same as those that would trigger a termination of the contract itself.  Since the appellants contend that renewal is automatic, they regard the contracts as having a perpetual term that is necessarily greater than 10 years.

We need not decide the precise contours of the good cause requirement under Washington law, because the appellants' argument is based on the flawed assumption that the "term" of the contracts necessarily includes any periods of renewal following the expiration of the contracts' designated duration of a "period of 10 years."  That argument is contrary to the most natural meaning of the word "term," as it is used in the contracts,

and it is also contrary to the parties' expressed intentions as to the matter and to the statutory and regulatory backdrop of the contractual arrangements at issue in this case.

The essence of the appellants' argument is that the "term" of the contract should be interpreted to include the renewal periods, in which case the contract "term" would be indefinite or perpetual. That interpretation is contrary to the ordinary meaning of the word "term," which is "a period of time with some definite termination." Black's Law Dictionary 1470 (6th ed. 1990). Moreover, interpreting the word "term" in the contract to include the renewal periods would render meaningless the "shall continue for a period of 10 years" clause in the contracts. If the parties intended to create a contractual relationship of indefinite duration, they could simply have provided that the contracts would remain in effect until either the landowners or the Bureau of Reclamation exercised their termination rights under Article 12. In order to give full effect to the parties' expressed intentions on the matter, the contracts must be understood as limited to 10-year "terms."

The relevant provisions of the 1956 Act support the conclusion that the "term" of a 9(e) contract does not refer to the combination of the stated term and any potential renewal periods. One of the objections to the utility-type contracts under section 9(e) was that the landowner could not be assured of a stable water supply because there was no guarantee that the Bureau of Reclamation would renew the contract upon expiration. See S. Rep. No. 84-2241, at 2, 5 (1956); H.R. Rep. No. 84-1754, at 2, 4 (1956). Responding to that concern, Congress provided in the 1956 Act that the Secretary of the Interior shall, upon request of the private contractor, include in any long-term 9(e) contract a provision for renewal of the contract "under stated terms and

conditions mutually agreeable to the parties." 43 U.S.C. § 485h-1(1). Congress also provided for long-term contract holders to receive certain water rights "during the term of the contract and of any renewal thereof." Id. § 485h-1(4). In distinguishing between the "term of the contract" and any subsequent periods of "renewal," that language reflects that Congress did not regard renewal periods as being included within the contract's "term" as that word was used in the statute.

Elsewhere in the 1956 Act, the word "term" is similarly used to refer to the duration of a repayment contract under section 9(d) of the 1939 Act. See 43 U.S.C. § 485h-1(2) ("within the term of a contract under subsection (d) of section 485h of this title"). Because the Bureau of Reclamation is generally prohibited from entering into 9(d) contracts that do not have fixed terms, see id. § 485h(d)(3), the use of the word "term" in connection with 9(d) contracts is consistent with the understanding that "term" refers to a fixed and designated period of time, not an open-ended, indefinite period. See Bankamerica Corp. v. United States, 462 U.S. 122, 129 (1983) (the same terms in the same statute should be interpreted in conjunction with each other).

The appellants' construction of the statute also fails to accord with the joint purposes of the 1956 legislation—to provide some assurance that landowners could count on a long-term supply of water, while preserving the Secretary's flexibility to employ short-term water service contracts. Under the appellants' interpretation of the word "term" in the statute, the Bureau of Reclamation could not enter into a short-term water service contract with a renewal clause that would assure the landowner of a stable water supply for a period greater than 10 years. Such a contract, in the appellants' view, would automatically become a long-term contract convertible to a

repayment contract. If that interpretation of the statute were correct, it would foreclose the Secretary from using short-term water service contracts while at the same time providing some form of assurance to the holders of such contracts that their access to water would not terminate after 10 years. In directing the Secretary of the Interior to address the concern of long-term contract holders regarding the stability of their water supply, it is unlikely that Congress intended to strip the Secretary of any authority to provide similar assurances to holders of short-term water service contracts. We therefore hold that the word "term" in the appellants' contracts refers to the designated 10-year term set forth in the contracts and does not include any periods of renewal following that initial 10-year term.

B

The appellants' second argument for disregarding the 10-year limitation is that the word "term" in the contracts is not a reference to the contract term per se, but instead refers to the period within which the government expects to recoup its fixed costs. The annual per-acre charge paid by the appellants consists of a construction component, which remains fixed, and an operation and maintenance component, which varies from year to year. The Bureau of Reclamation calculated the annual construction component ($1.70 per acre) by amortizing the total construction cost per acre of irrigated land ($85 per acre) over a 50-year period. The appellants argue that the "term" of their contracts is 50 years because that is the period within which the government will have recovered the construction costs apportioned to the appellants.

The problem with that argument is that the appellants' contracts do not in any way tie the contract "term" to the government's recovery of construction costs. Article 6

clearly provides that the contracts "shall continue for a period of 10 years," with the possibility of being renewed for "additional like periods." Although the contracts set the annual construction component at $1.70 per acre, they omit any mention of the total per acre construction costs that were apportioned to the appellants. Since the contracts themselves do not admit of any method for calculating the repayment period, there is no basis for concluding that the parties intended the contract "term" to be a 50-year repayment period.

Similarly, there is no indication that Congress intended the "term" of a 9(e) contract to be equal to the number of years it would take the Bureau of Reclamation to recover its construction costs. For 9(d) contracts, the contract term is closely tied to the repayment period because the statute expressly requires the irrigation district or water users' association to assume a "general repayment obligation" that "shall be spread in annual installments . . . over a period of not more than 40 years." 43 U.S.C. § 485h(d)(3). Under a 9(e) contract, by contrast, the landowner assumes liability only for a variable annual charge for the delivery of irrigation water. The only temporal limitation on 9(e) contracts to furnish water is that

> [e]ach such contract shall be for such period, not to exceed forty years,
> . . . as in the Secretary's judgment will produce revenues at least sufficient
> to cover an appropriate share of the annual operation and maintenance
> cost and an appropriate share of such fixed charges as the Secretary
> deems proper . . . .

Id. § 485h(e). Because there is no reference to a repayment obligation in section 9(e), the period within which the government may recover its costs is not relevant to determining the "term" of any contracts executed pursuant to that provision.

Accordingly, we conclude that the appellants' contracts are not long-term contracts within the meaning of section 485h-3 and are therefore not entitled to the benefits accorded to such contracts under section 485h-1.

V

We next turn to the appellants' theory that even if their contracts are short-term contracts, they nonetheless should be treated as "repayment contracts," as that term is used in the 1939 Act. If their contracts are repayment contracts, the appellants assert that they are entitled by statute to operate and manage the irrigation works and to receive credit toward their general repayment obligation for any past overcharges.

According to the appellants, a repayment contract is any contractual arrangement in which the United States recoups the construction costs of a reclamation project. Because the water use charges in the appellants' contracts include a construction component, the appellants argue that their contracts must be repayment contracts. More broadly, they contend that because both sections 9(d) and 9(e) direct the Secretary to set water rates in part based on project construction costs, contracts under both sections 9(d) and 9(e) are all repayment contracts.

The first problem with the appellants' theory is that it is contrary to the very first sentence of section 9(e). That subsection begins, "In lieu of entering into a repayment contract pursuant to the provisions of subsection (d) . . . the Secretary, in his discretion, may enter into either short- or long-term contracts to furnish water for irrigation purposes." The effect of that sentence is to identify 9(d) contracts as "repayment contracts" and 9(e) contracts as water service contracts.

That straightforward reading of the statute is consistent with the legislative background. Prior to 1956, irrigation districts and landowners voiced their concern that section 9(e) seemed to be a departure from the general principle of reclamation law that landowners would acquire statutory management and water rights when the construction costs of the project had been repaid. While Congress was mindful of those concerns when it enacted the 1956 legislation, the committee reports confirmed that the "so-called water service or utility type contracts as authorized by the Reclamation Project Act of 1939 represented an innovation in reclamation law" and that "the principles of the two sections [9(d) and 9(e)] are generally accepted." S. Rep. No. 84-2241, at 2 (1956). The reports further explained that the 1956 Act was merely "directed toward perfecting the basis for the administration" of sections 9(d) and 9(e) of the 1939 Act, while "avoid[ing] any amendment to the text" of those sections. Id. Although Congress supplemented section 9(e) in several material respects in the 1956 Act, it clearly did not discard the water service or utility-type contract that was embodied in that section.

The 1956 Act carefully set forth a series of statutory benefits that apply to "long-term" contracts, which are defined as contracts having a term of greater than 10 years. 43 U.S.C. §§ 485h-1 to 485h-3. In many respects, those benefits were designed to replicate the features of contracts under section 9(d) of the 1939 Act, which are clearly repayment contracts. Significantly, however, Congress did not simply relabel "long-term" contracts as "repayment contracts"; nor did it extend repayment-type benefits to holders of short-term 9(e) contracts.

Excluding 9(e) contracts from the class of "repayment contracts" is not inconsistent with the various statutory provisions cited by the appellants as support for their argument. A "repayment contract" is defined as "any contract providing for payment of construction charges to the United States." 43 U.S.C. § 485a(e). "Construction charges" are defined, in turn, as "the amounts of principal obligations, payable to the United States." Id. § 485a(d). The 1939 Act expressly states that 9(d) repayment contracts include a "general repayment obligation." Id. § 485h(d)(3). Holders of 9(e) contracts, however, are not required to assume a "general repayment obligation" or any other "principal obligation." Instead, their payments reflect "an appropriate share of such fixed charges as the Secretary deems proper, due consideration being given to that part of the cost of construction of works connected with water supply and allocated to irrigation." Id. § 485h(e). The use of the term "fixed charges" in section 9(e), rather than "construction charges," "principal obligation," or "general repayment obligation," indicates that Congress did not intend 9(e) contracts to be classified as repayment contracts.

As we noted above, in calculating the amount of the "fixed charge," the Secretary is required to give "due consideration . . . to that part of the cost of construction of works connected with water supply and allocated to irrigation." 43 U.S.C. § 485h(e). As with any utility-type contract, however, the consumer does not assume an obligation to repay the construction costs of the utility merely because the utility takes into account its fixed infrastructure costs in setting the price for its commodity service. The direction to the Secretary to account for "the cost of construction" simply reflects Congress's judgment as to the amount of revenue that ought to be generated by 9(e) contracts.

The appellants point to section 7(b) of the 1939 Act, 43 U.S.C. § 485f(b), as support for the proposition that any contract executed pursuant to section 9(e) is a repayment contract. Section 7(b) authorizes the Secretary of the Interior to enter into a "repayment contract . . . in accordance, as near as may be, with the provisions [of sections 9(d) or 9(e)]" for any project under construction on the effective date of the 1939 Act. In the appellants' view, it would be inconsistent with the text of section 7(b) to hold that 9(d) contracts are repayment contracts but 9(e) contracts are not.

Section 7(b) does not, as the appellants contend, implicitly define the nature of any contracts executed under the authority of sections 9(d) and 9(e). The references to sections 9(d) and 9(e) merely specify the various provisions in the 1939 Act that the Secretary must consider when relying on section 7(b), which constitutes an independent source of the Secretary's authority to enter into a repayment contract. Although section 9(e) generally sets forth the statutory basis for the Secretary's authority to enter into water service contracts, and not repayment contracts, that subsection also provides that:

> In the event such contracts [under section 9(e)] are made for furnishing water for irrigation purposes, the costs of any irrigation water distribution works constructed by the United States in connection with the new project, new division of a project, or supplemental works on a project shall be covered by a repayment contract entered into pursuant to subsection (d) of this section.

43 U.S.C. § 485h(e). In light of that passage, the reference to section 9(e) simply confirms that the Secretary, when using his authority under section 7(b), should use a repayment contract in connection with "irrigation water distribution works," such as canals and laterals, just as section 9(e) directs him to do for such projects generally.

The appellants argue that short-term contracts were already "repayment contracts" under the 1939 Act and that their status as such was unaffected by the 1956 Act, notwithstanding that the later-enacted statute extended a number of repayment-type benefits to long-term 9(e) contracts. It would be incongruous, however, to attribute to Congress the intent to provide greater benefits to short-term contracts than to long-term contracts. For example, one of the benefits conferred by the 1956 Act is that long-term contracts may be converted to 9(d) contracts "under stated terms and conditions mutually agreeable to the parties." 43 U.S.C. § 485h-1(2). Under the appellants' theory, short-term contracts are entitled to be treated as 9(d) contracts even absent an agreement with the Secretary of Interior. It is clear that in the 1956 Act Congress intended to grant certain benefits to long-term contract holders that were not previously available. Congress's silence on the subject of short-term 9(e) contracts compels the conclusion that those contracts were not intended to have benefits comparable to those of long-term 9(e) contracts, much less those of 9(d) contracts.

In addition to the language of section 9(e) itself, there is ample contextual support in the 1956 Act for the distinction between short-term 9(e) contracts, on the one hand, and 9(d) and long-term 9(e) contracts, on the other. For example, Section 1(4) of the 1956 Act provides in pertinent part

> that the other party to any contract entered into pursuant to [section 9(d)] or to any long-term contract entered into pursuant to [section 9(e)] shall . . . have a first right (to which right the rights of the holders of any other type of irrigation water contract shall be subordinate) to a stated share or quantity of the project's available water supply for beneficial use on the irrigable lands within the boundaries of, or owned by, the party . . . .

43 U.S.C. § 485h-1(4). Congress clearly contemplated a residual category of "irrigation water contracts" that would not be entitled to the same water rights as 9(d) contracts

and long-term 9(e) contracts. In the absence of any specific exclusion for short-term 9(e) contracts, there can be little doubt that short-term 9(e) contracts fall within the category of "irrigation water contracts" that were intended to be treated differently from 9(d) contracts and long-term 9(e) contracts.

The appellants further argue that the distinction between short-term and long-term contracts under section 9(e) mirrors the distinction between "toll-charge" contracts and repayment contracts under section 9(d). The 1939 Act authorized the Secretary of the Interior to provide for a "development period" of up to 10 years before triggering the landowners' repayment obligation under a 9(d) contract. 43 U.S.C. § 485h(d)(1). During the development period, the landowners were expected to pay a "toll charge" for the delivery of project water. Id. According to the appellants, the Secretary of the Interior lacks the authority to enter into a short-term 9(e) contract except for the purpose of a development period; they argue that when a short-term 9(e) contract is in place for more than 10 years it must be converted into a long-term 9(e) contract.

While it is true that Congress has chosen 10 years as the maximum allowable duration for both development periods and short-term contracts, that fact standing alone does not justify the inference that the appellants press upon us. Nothing in either the text or legislative history of the 1939 Act suggests that Congress intended short-term 9(e) contracts to serve only as analogues to the toll-charge contracts authorized under section 9(d) for development periods. We therefore reject the suggestion that the Secretary cannot execute a short-term contract under section 9(e) except for the period authorized for a "development period" toll-charge contract.

The appellants next contend that the United States is collaterally estopped from denying that their contracts are repayment contracts because the Ninth Circuit already decided that issue in Flint v. United States, 906 F.2d 471 (9th Cir. 1990). In Flint, landowners in the Quincy Basin area challenged the operation and maintenance charges in their water service contracts, which are identical to the contracts at issue in this appeal. The Flint court held that: (1) the amounts charged by the Secretary of the Interior were committed to his discretion; (2) the Secretary did not exceed his authority under state law in assessing the charges; and (3) the plaintiffs had no property interest in the artificially stored groundwater that could be taken by the United States. 906 F.2d at 476–77. While the court in Flint referred to the contracts as "repayment contracts," there is no indication that the issue of the character of the contracts was briefed by the parties or that the court intended to address that legal issue. Accordingly, we conclude that the question whether the appellants' contracts are repayment contracts was neither litigated nor decided in the prior proceeding and that the court's characterization of the contracts is therefore not binding on the government in this case. See, e.g., Killeen v. Office of Pers. Mgmt., 558 F.3d 1318, 1323 (Fed. Cir. 2009).

We therefore reject the appellants' argument that their contracts are "repayment contracts," as defined in section 2(e) of the 1939 Act, 43 U.S.C. § 485a(e).

VI

The appellants next argue that even if their contracts do not include an obligation to repay the government's construction costs, the Bureau of Reclamation is constrained by its earlier determination that their contracts are entitled to the statutory benefits reserved for repayment contracts and long-term 9(e) contracts. Because the appellants'

assertions in that regard focus on the Bureau's enforcement of excess land limitations, we briefly recount the historical development of those limitations in reclamation law.

As part of a general policy to encourage settlement in the western states, Congress designed the Reclamation Act of 1902 to provide federally subsidized water to small, family-sized farms. To promote that objective, Congress provided in section 5 of the 1902 Act that "[n]o right to the use of water . . . shall be sold for a tract exceeding 160 acres to any one landowner." 43 U.S.C. § 431. Congress later directed that project water would be withheld from any lands in excess of 160 acres in single ownership unless the owner executed a recordable contract to sell excess land at a discount price that did not reflect the appreciation in value attributable to the availability of project water. Id. § 423e. Over time, the Bureau of Reclamation came to accept certain practices that were designed to avoid the 160-acre limitation, such as executing recordable contracts under a trust or limited partnership arrangement and increasing the acreage serviced by project water by leasing irrigated property that exceeded 160 acres. See, e.g., Peterson v. Dep't of the Interior, 899 F.2d 799, 801–02 (9th Cir. 1990); 4 Robert E. Beck, Water & Water Rights 41-19 (1991); Trelease & Gould, supra, at 697.

In the Reclamation Reform Act of 1982, Title II of Pub. L. No. 97-293, 96 Stat. 1261, codified at 43 U.S.C. §§ 390aa–390zz ("RRA"), Congress closed several of the loopholes that landowners had previously used, while it also increased the total number of acres, whether owned or leased, to which project water could be delivered on a subsidized, or "non-full cost," basis. Holders of excess lands could nonetheless receive project water if they executed recordable contracts disposing of the excess lands within a reasonable time or if they were willing to pay "full cost" for water delivered to those

lands. 43 U.S.C. §§ 390ee, 390ii. The most controversial provision of the RRA was the so-called "hammer clause," which put landowners with existing water supply contracts to a choice: They either had to amend their contracts to conform to the requirements of the RRA or continue to accept project water under their current contracts but pay the government's "full cost" of delivering water to leased lands in excess of 160 acres. See id. § 390cc(b); Peterson, 899 F.2d at 801.

The appellants point out that the Bureau of Reclamation has repeatedly required them to execute short-term 9(e) contracts incorporating all of the excess land limitations in the RRA and pre-1986 reclamation law. Because those limitations have been enforced against the appellants, they argue that the Bureau has effectively deemed their contracts sufficient to trigger the statutory benefits granted to repayment contracts and long-term 9(e) contracts. The appellants' argument depends on the assumption that the RRA and the pre-1986 excess land limitations apply only to repayment contracts and long-term 9(e) contracts. As we have already decided, however, the appellants' contracts are short-term 9(e) contracts because they have 10-year terms and because they do not contemplate a "general repayment obligation." Thus, the appellants are essentially arguing that the Bureau erred in applying the excess land limitations to their contracts, but that having done so the Bureau must extend to them the benefits of repayment contracts and long-term 9(e) contracts.

We need not decide whether the RRA and pre-1986 excess land limitations apply to short-term 9(e) contracts, because it is clear that applying those provisions to the appellants' contracts did not affect either the 10-year term of their contracts or their obligation to pay a water rental charge. The appellants do not contend that the RRA

and pre-1986 excess land limitations require the execution of a repayment contract or a long-term 9(e) contract, at least where such contracts were not already in effect. Nor do they contend that the excess land statutes grant the Secretary of the Interior discretionary authority to enter into a repayment contract or a long-term 9(e) contract where none existed before. See, e.g., 43 U.S.C. §§ 390cc(d), 390ee(b).

To be sure, both the RRA and pre-1986 excess land laws give rise to legal consequences that depend on the type of contractual arrangement entered into by the parties. By way of example, the RRA applies only to a "repayment or water service contract between the United States and a district providing for the payment of construction charges to the United States including normal operation, maintenance, and replacement costs pursuant to Federal reclamation law." 43 U.S.C. § 390bb(1). Also under the RRA, the ownership and "full cost" limitations cease when "the obligation of a district for the repayment of the construction costs of the project facilities used to make project water available for delivery to such lands shall have been discharged by a district." Id. § 390mm(a). However, while the issue the appellants raise may go to what their obligations are under the RRA, that issue does not affect the nature of their contracts with the Bureau of Reclamation.

It may be that the Bureau of Reclamation erred in enforcing the excess land laws against the appellants' contracts. But the appellants have not squarely presented that issue to us, nor did they present it to the district court; it is therefore not before us, and we do not decide that question. See Novosteel SA v. United States, 284 F.3d 1261, 1273–74 (Fed. Cir. 2002). Because we are concerned only with whether the appellants are entitled to the statutory benefits accorded to repayment contracts and long-term 9(e)

contracts under the 1939 and 1956 Acts, and because those benefits turn on whether the appellants' contracts include a principal repayment obligation or have a contract term greater than 10 years, it is sufficient to note that the RRA and the pre-1986 excess land limitations do not change the fact that the appellants hold short-term 9(e) contracts.

Accordingly, we affirm the district court's decision granting the government's motion to dismiss the action.

VII

The appellants have also challenged the district court's denial of their motion to strike certain affidavits that were attached as exhibits to the government's opposition to their motions for summary judgment. After granting the government's motion to dismiss, the district court denied "all other pending motions," including the appellants' motion to strike, as moot. Because we affirm the district court's dismissal on the merits, and because the district court did not rely on any of the contested affidavits that were the subject of the motion to strike in connection with the dismissal order, we need not address the appellants' contention that the district court should not have denied their motion or should not have treated it as moot.

Each party shall bear its own costs for this appeal.

<u>AFFIRMED</u>.