Filed 8/7/23  Westlands Water District v. All Persons Interested CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| WESTLANDS WATER DISTRICT,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>ALL PERSONS INTERESTED etc., et al.,<br><br>Defendants and Respondents. | F083632 & F084202<br><br>(Super. Ct. No. 19CECG03887)<br><br>**OPINION** |

APPEALS from a judgment of the Superior Court of Fresno County.  Alan M. Simpson and D. Tyler Tharpe, Judges.

Stradling Yocca Carlson & Rauth, Allison E. Burns and Douglas S. Brown for Plaintiff and Appellant.

Freeman Firm, Thomas H. Keeling; Law Office of Roger B. Moore, Roger B. Moore; Mohan Harris Ruiz and S. Dean Ruiz for Defendants and Respondents County of San Joaquin, County of Trinity, Central Delta Water Agency and South Delta Water Agency.

Law Offices of Stephan C. Volker, Stephan C. Volker, Alexis E. Krieg, Stephanie L. Clarke and Jamey M.B. Volker for Defendants and Respondents North

Coast Rivers Alliance, Winnemem Wintu Tribe, California Sportfishing Protection Alliance, Institute for Fisheries Resources, Pacific Coast Federation of Fishermen's Associations, and San Francisco Crab Boat Owners Association.

Law Office of Adam Keats, Adam Keats; and John Buse for Defendants and Respondents California Water Impact Network, California Indian Water Commission, AquAlliance, Planning and Conservation League, and Center for Biological Diversity.

-ooOoo-

"An action under the validation statutes permits a public agency to obtain a judgment upholding its handling of an agency matter." (*Davis v. Fresno Unified School Dist*. (2023) 14 Cal.5th 671, 684.)  Westlands Water District (Westlands) appeals from a judgment of dismissal entered in a validation action filed pursuant to, inter alia, Code of Civil Procedure section 860 et seq.  The subject matter was an anticipated contract between Westlands and the United States concerning the ongoing delivery of federal reclamation project water and repayment of certain financial obligations.

We say "anticipated contract" because Westlands filed the action several months prior to executing a finalized agreement with the United States.  Westlands presented the superior court with a working draft of the contract, requesting a judicial decree validating (1) the authorization given by its governing body to execute a contract "in substantially the [same] form" at a later date and (2) the legality and enforceability of the contract under California law.  Several public entities, nonprofit organizations, public interest groups, and others participated in the lawsuit by opposing any and all such relief, making them the defendants in the action.  The federal government is not a party to the case.[1]

---

[1]Three sets of respondents' briefs have been filed in this appeal.  The first was jointly submitted by the County of San Joaquin, the County of Trinity, the Central Delta Water Agency, and the South Delta Water Agency.  The second was jointly submitted by the North Coast Rivers Alliance, Pacific Coast Federation of Fishermen's Associations, San Francisco Crab Boat Owners Association, California Sportfishing Protection Alliance, Institute For Fisheries Resources, and the Winnemem Wintu Tribe.  The third was jointly submitted by the California Water Impact Network, the California Indian Water Commission, AquAlliance, the Planning and

The superior court declined to grant relief, and ultimately dismissed Westlands' validation action, for multiple reasons. Most pertinently, the draft was found to be materially deficient in its failure to specify Westlands' financial obligations under the anticipated contract. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*Overview*

"California's two largest rivers, the Sacramento and the San Joaquin Rivers, meet to form a delta (California Delta or Delta) near the City of Sacramento, and their combined waters, if not diverted, flow through the Delta, Suisun Bay, and San Francisco Bay, to the Pacific Ocean. The flow of water through this region, commonly known as the Bay-Delta, forms the largest estuary on the West Coast of the United States. It is also the hub of California's two largest water distribution systems, supplying drinking water for two-thirds of California's residents and irrigation water for seven million acres of agricultural land." (*In re Bay-Delta etc*. (2008) 43 Cal.4th 1143, 1151.)

"In an effort to manage the increasing and conflicting demands placed on the water flowing through the [Bay-Delta], California and the United States have embarked on two massive projects. First, in 1933, California proposed the Central Valley Project (CVP), a plan to transfer water from the Sacramento River to water-deficient areas in the San Joaquin Valley and from the San Joaquin River to the southern regions of the Central Valley." (*San Luis & Delta-Mendota Water Authority v. Jewell* (9th Cir. 2014) 747 F.3d 581, 594.) "In 1951, California approved what is known as the State Water Project," which primarily "serves the domestic water needs" of Southern California. (*Ibid*.)

Due to "pervasive unfavorable economic conditions during the Great Depression, California turned to the federal government for assistance to finance and construct the CVP." (*Westlands Water Dist. v. U.S.* (E.D.Cal. 2001) 153 F.Supp.2d 1133, 1142.)

Conservation League, and the Center for Biological Diversity. These parties are collectively referred to as "respondents."

Acting pursuant to federal reclamation law, the United States "assumed the role of building and operating the CVP." (*Ibid*.) The project is currently administered by the Bureau of Reclamation (Bureau), an agency within the Department of the Interior. (*San Luis Unit Food Producers v. U.S.* (9th Cir. 2013) 709 F.3d 798, 800–801.) The federal government holds CVP water rights, and direct access to CVP water requires a contract with the Bureau. (*Tehama-Colusa Canal Authority v. U.S. Department* (9th Cir. 2013) 721 F.3d 1086, 1091; *Westlands Water Dist. v. U.S.*, *supra*, at p. 1144; see *In re Bay-Delta etc.*, *supra*, 43 Cal.4th at p. 1154 [noting the Bureau operates the CVP under rights granted by the California State Water Resources Control Board].)

The CVP is now "a system of dams, reservoirs, levees, canals, pumping stations, hydropower plants, and other infrastructure." (*Orff v. United States* (2005) 545 U.S. 596, 598.) "With total storage capacity of more than 12 million acre-feet, the CVP delivers approximately seven million acre-feet of water annually to over 250 water contractors, primarily for agricultural use in the Central Valley. [Citation.] The CVP '"supplies two hundred water districts, providing water for about thirty million people, irrigating California's most productive agricultural region and generating electricity at [numerous] powerplants."'" (*North Coast Rivers Alliance v. Westlands Water Dist.* (2014) 227 Cal.App.4th 832, 840.)

"The contemporary CVP consists of nine distinct geographic areas, known as 'divisions.' [Citation.] These are the: (1) Trinity; (2) Shasta; (3) Sacramento; (4) American River; (5) Delta; (6) Eastside; (7) San Felipe; (8) West San Joaquin; and (9) Friant Divisions." (*Westlands Water Dist. v. U.S.*, *supra*, 153 F.Supp.2d at p. 1142.) Each division "has at least one subset 'unit,' which itself is comprised of various facilities, e.g., a dam and a power plant." (*Id*. at p. 1144.) For example, the West San Joaquin Division includes the San Luis Unit, which comprises "'the San Luis Dam and the San Luis Reservoir, together with a number of smaller facilities.'" (*Id*. at p. 1145, fn. omitted.) "Water from the San Luis Unit of the CVP is delivered to contractors," who in

4.

turn "provide water to the end users such as farmers on the west side of the Central Valley." (*North Coast Rivers Alliance v. Westlands Water Dist.*, *supra*, 227 Cal.App.4th at p. 841.)

Appellant Westlands is a public agency formed "for the purpose of receiving CVP water and distributing that water to end users (i.e., farmers) for beneficial use (i.e., irrigation to grow crops) on lands within [its service area]." (*North Coast Rivers Alliance v. Westlands Water Dist.*, *supra*, 227 Cal.App.4th at p. 839.) It is both "the largest contractor for water from the San Luis Unit" (*Westlands Water Dist. v. U.S.* (9th Cir. 2003) 337 F.3d 1092, 1097) and the largest of all CVP contractors in the state. Westlands delivers CVP water to over 600,000 acres of farmland in Fresno and Kings Counties.

Respondents are a diverse group of litigants with shared concerns about the environmental impacts of various CVP operations. "Competition for the Bay-Delta's resources, pollution of Bay-Delta water, draining and filling of tidal marshes and other wetlands, and diversion of Bay-Delta water for urban and agricultural uses throughout the state have … resulted in a decline in Bay-Delta wildlife habitat, the threatened extinction of plant and animal species, an increasing risk of failure of Bay-Delta levees, and degradation of the Bay-Delta as a reliable source of high quality water." (*In re Bay-Delta etc.*, *supra*, 43 Cal.4th at p. 1151.) "Water quality and land use conflict because water returned to the Bay-Delta after urban and agricultural use contains pollutants and contaminants that degrade water quality." (*Id*. at p. 1158.) "The pollutants of upstream urban and agricultural uses cause problems for downstream fish and water diverters alike." (*Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1035.)

Respondents allege that Westlands' operations harm fish and wildlife and "exacerbate[] the existing contamination of the soils, groundwater and surface waters of

the San Joaquin Valley and downstream."[2]  These allegations are heavily emphasized in some of the briefing, but this appeal is resolved on other grounds and we express no views regarding those contentions.  As in prior cases involving these parties, this overview and all additional background information are provided "so that the issues before us may be seen within their larger context."  (*North Coast Rivers Alliance v. Westlands Water Dist.*, *supra*, 227 Cal.App.4th at p. 840.)

### Prior and Contemporaneous Contract Litigation

"With the Reclamation Act of 1902, Congress committed itself to the task of constructing and operating dams, reservoirs, and canals for the reclamation of the arid lands in 17 western states."  (*Peterson v. U.S. Dept. of Interior* (9th Cir. 1990) 899 F.2d 799, 802.)  Those projects were to be funded by the sale of federal land, but "almost immediately the funds proved inadequate, and Congress had to restructure the program's financing.  In a series of amendments to the Act, Congress provided that a portion of the capital costs of the projects, as well as a portion of their operating and maintenance costs, would be charged to the users."  (*Id*. at p. 804.)  Since that time, "reclamation law has been based on the concept of project repayment—reimbursement of federal construction costs—by project water and power users."  (Stern, Congressional Research Service,

---

[2]"Any water project that brings fresh water to an agricultural area must take the salty water remaining after the crops have been irrigated away from the service area."  (*Firebaugh Canal Co. v. U.S.* (9th Cir. 2000) 203 F.3d 568, 571.)  Inadequate drainage of CVP water from the San Luis Unit was recognized as a potential problem when Congress authorized its construction in the 1960's.  (*Id*. at pp. 570–571.)  As discussed in *North Coast Rivers Alliance v. Westlands Water Dist.*, *supra*, 227 Cal.App.4th 838, a "statutory obligation to provide for such drainage was placed squarely on the United States Department of the Interior," but the obligation "remains unfulfilled."  (*Id*. at pp. 841–842; see Stern et al., Congressional Research Service, *Central Valley Project:  Issues and Legislation* (Apr. 20, 2023) p. 31, at <https://crsreports.congress.gov/product/pdf/R/R45342> [stating Westlands is currently "involved in a major proposed settlement" with the Bureau regarding the Bureau's "responsibility to construct drainage facilities to deal with toxic runoff associated with naturally occurring metals in area soils"].)

*Accelerated Repayment of Bureau of Reclamation Construction Costs* (Sept. 30, 2015) p. 1, at <https://crsreports.congress.gov/product/pdf/IF/IF10295>.)

There are two relevant types of contracts for federal reclamation project water: repayment contracts and water service contracts. "Repayment contracts are generally made for terms of 40 years, with capital costs amortized over the long-term period and repaid in annual installments …. Costs are repaid annually in fixed amounts to the U.S. Treasury by project beneficiaries (contractors), along with costs for project operations and maintenance. For water service contracts, contractors pay a combined capital repayment and operations and maintenance (O&M) rate for each acre-foot of water actually delivered (i.e., water service)." (Stern, *Accelerated Repayment of Bureau of Reclamation Construction Costs*, *supra*, at p. 1; accord, 43 U.S.C. § 485h(d), (e); *Grant County Black Sands Irrigation Dist. v. U.S.* (Fed.Cir. 2009) 579 F.3d 1345, 1351–1354.)

Because the CVP "includes many multipurpose facilities benefiting different contractors that were built over many decades," most CVP contractors have historically operated under water service contracts. (Stern, *Accelerated Repayment of Bureau of Reclamation Construction Costs*, *supra*, at p. 1.) Such contracts "establish the rates and other terms for [(1)] water delivery, [(2)] to produce sufficient revenue to recover an appropriate share of the federal government's capital investment, and [(3)] to repay the Bureau's annual operation and maintenance costs." (*North Coast Rivers Alliance v. Westlands Water Dist.*, *supra*, 227 Cal.App.4th at p. 844.) They are "the mechanisms used to recover each contractor's share of these costs as a condition for receiving CVP water." (*Ibid.*)

In 1963, Westlands and the Bureau entered into a 40-year water service contract for the delivery of CVP water from the San Luis Unit (hereafter "the 1963 contract" or "contract No. 14-06-200-495-A"). "Since 1978, the contract has generated extensive litigation." (*Orff v. United States*, *supra*, 545 U.S. at p. 599; see *O'Neill v. U.S.* (9th Cir. 1995) 50 F.3d 677, 680–682 [chronicling pertinent litigation history].) In 1986, a

7.

stipulated judgment in a lawsuit concerning the 1963 contract recognized Westlands' right to receive up to 1.15 million acre-feet of CVP water per year, subject to water availability and other contingencies.  (*North Coast Rivers Alliance v. Westlands Water Dist.*, *supra*, 227 Cal.App.4th at pp. 839, 844.)  The stipulated judgment also extended the 1963 contract through the end of 2007.  (*U.S. v. Westlands Water Dist.* (E.D.Cal. 2001) 134 F.Supp.2d 1111, 1142, fn. 70.)  An original provision allowing for subsequent 40-year renewal periods remained in effect.  (See *North Coast Rivers Alliance*, at p. 844 & fn. 16.)

"In 1992, in what was seen as a victory for environmentalists, Congress passed the Central Valley Project Improvement Act (Pub.L. No. 102-575 (Oct. 30, 1992) 106 Stat. 4706), which elevated fish and wildlife protection and restoration to the status of a primary purpose of the CVP, reserved 800,000 acre-feet of CVP water for environmental and wildlife protection purposes, and prohibited new water contracts."  (*In re Bay-Delta etc.*, *supra*, 43 Cal.4th at p. 1154.)  The Central Valley Project Improvement Act (CVPIA) allowed for the renewal of existing long-term water service contracts, but only for periods of up to 25 years.  (CVPIA, § 3404(c).)  Such renewals were further conditioned upon the Bureau's "completed preparation of a programmatic environmental impact statement (EIS) that examined the effects on the environment…."  (*North Coast Rivers Alliance v. Westlands Water Dist.*, *supra*, 227 Cal.App.4th at pp. 844–845, citing CVPIA, §§ 3404(c), 3409.)  "Until that environmental documentation was completed, the Bureau was authorized by the CVPIA to enter into *interim* renewal contracts of up to three years on the first occasion, and for successive interim periods of up to two years in length thereafter."  (*North Coast Rivers Alliance*, at p. 845.)

By late 2007, when the 1963 contract was about to expire, "the Bureau had not yet completed its environmental documentation necessary for the execution of a long-term (25-year) renewal of the water service contract with Westlands Water District."  (*North Coast Rivers Alliance v. Westlands Water Dist.*, *supra*, 227 Cal.App.4th at p. 845.)  The

8.

parties entered into an interim renewal contract (contract No. 14-06-200-495A-IR1), which provided for the delivery of water from the San Luis Unit and Delta Division of the CVP for a period of approximately 26 months (Jan. 1, 2008 through Feb. 28, 2010). Five additional interim renewal contracts were executed between 2010 and 2018, successively labeled as contract Nos. 14-06-200-495A-IR2, 14-06-200-495A-IR3, 14-06-200-495A-IR4, 14-06-200-495A-IR5, and 14-06-200-495A-IR6.

The Bureau also entered into multiple interim renewal contracts with Westlands Water District Distribution District No. 1 (Westlands DD #1) and Westlands Water District Distribution District No. 2 (Westlands DD #2).  The history and purpose of those distribution districts is explained in *North Coast Rivers Alliance v. Westlands Water Dist.*, *supra*, 227 Cal.App.4th at pages 839 and 845–846.  Although closely related to Westlands, they are distinct public entities.  (*Id.* at pp. 838–839 & fn. 1; see Wat. Code, § 36460 ["Land within a water district, which need not be contiguous, may be formed into a distribution district for the purpose of contracting with the United States"].)  Westlands DD #1 and Westlands DD #2 are not parties to this appeal, but their contracts with the Bureau are discussed elsewhere in the opinion and have relevance to the issues in dispute.

The interim renewal contracts between Westlands and the Bureau sparked protracted legal battles initiated by many of the respondents herein, e.g., the "coalition of environmental organizations led by the North Coast Rivers Alliance."  (*N. Coast Rivers Alliance v. U.S. Dept. of Interior* (E.D.Cal. 2018) 313 F.Supp.3d 1199, 1200.)  In 2010, for example, North Coast Rivers Alliance and others filed a petition for writ of mandate and a complaint for declaratory and injunctive relief in the Fresno Superior Court regarding, inter alia, interim renewal contract No. 14-06-200-495A-IR2.  The case concerned the applicability of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA).  The superior court ruled that a statutory exemption for ongoing projects applied to the contract, and the plaintiffs' appeal was dismissed as moot

9.

because the contract expired while the appeal was pending. (*North Coast Rivers Alliance v. Westlands Water Dist.* (Apr. 11, 2012, F062357) [nonpub. opn.].)

In 2012, North Coast Rivers Alliance and others petitioned the Fresno Superior Court for a writ of mandate regarding, inter alia, the third interim renewal contract between Westlands and the Bureau, i.e., contract No. 14-06-200-495A-IR3. (*North Coast Rivers Alliance v. Westlands Water Dist.*, *supra*, 227 Cal.App.4th at pp. 845, 847.) This contract was also determined to be exempt from CEQA. (227 Cal.App.4th at p. 848.) The plaintiffs appealed and, despite the same issue of mootness, this court exercised its discretion to hear the case on the merits. (*Id.* at p. 849.) Westlands prevailed.

In early 2016, North Coast Rivers Alliance and others filed a lawsuit in the United States District Court for the Eastern District of California (case No. 1:16-cv-00307; hereafter the "federal court action") challenging the legality of multiple interim renewal contracts between the Bureau and CVP water contractors, including the fifth interim renewal contract between the Bureau and Westlands, i.e., contract No. 14-06-200-495A-IR5. (*N. Coast Rivers Alliance v. U.S. Dept. of Interior*, *supra*, 313 F.Supp.3d at p. 1200.) As initially filed, the federal court action concerned whether the Bureau's approval of the interim renewal contracts violated the National Environmental Policy Act (42 U.S.C. § 4321 et seq.) and/or the Administrative Procedure Act (5 U.S.C. §§ 701–706). The case is ongoing. (See further discussion, *post*).

In late 2016, Congress enacted the Water Infrastructure Improvements for the Nation Act (Pub.L. No. 114-322 (Dec. 16, 2016) 130 Stat. 1628) (WIIN Act). As relevant here, the WIIN Act authorized a limited-time opportunity for water contractors to convert their existing water service contracts with the Bureau to repayment contracts. (WIIN Act, § 4011; see *id.*, § 4013 ["This subtitle shall expire on the date that is 5 years after the date of its enactment"].) Such conversions were contingent, however, upon the repayment of all outstanding project construction cost obligations in a "lump sum," or "in

approximately equal installments, no later than 3 years after the effective date of the repayment contract ….." (*Id*., § 4011(a)(2)(A).)

"[P]rior to the WIIN Act, no such blanket authority for accelerated repayment existed for [federal reclamation] projects in general." (Stern et al., Congressional Research Service, *Water Infrastructure Improvements for the Nation* (*WIIN*) *Act: Bureau of Reclamation and California Water Provisions* (Dec. 14, 2018) p. 23, at <https://crsreports.congress.gov/product/pdf/R/R44986>.) "Generally speaking, one of the advantages to such conversion is that once [the capital costs] are repaid in full, contractors are not subject to certain acreage limitations" and related pricing provisions of federal reclamation law. (*Ibid*.; accord, *Hoopa Valley Tribe v. U.S. Bureau of Reclamation* (E.D.Cal. Dec. 29, 2022, No. 1:20-cv-1814-JLT-EPG) __ F.Supp.3d __, __, fn. 1 [2022 U.S. Dist. LEXIS 232992, *2; 2022 WL 17994327, *1]; see WIIN Act, § 4011(c)(1).) But just as those incentives are viewed positively by contractors such as Westlands, respondents are strongly opposed to them.[3]

---

[3] "Another early tenet of reclamation law still in existence is a limit on how much land one can irrigate with water provided from federal reclamation projects. The idea behind the limitation was to prevent speculation and monopolies in western land holdings and to promote development and expansion of the American West through establishment of family farms." (Stern, *Accelerated Repayment of Bureau of Reclamation Construction Costs*, *supra*, at p. 1.) "Instead, through leasing arrangements and other devices, the water districts and large farming interests, with the acquiescence of the [Bureau], 'found ways to circumvent the [original] 160-acre limitation,' [citation], resulting in the enormous federal subsidies involved in supplying reclamation water being provided very large farming operations." (*Natural Resources Defense Council v. Duvall* (E.D.Cal. 1991) 777 F.Supp. 1533, 1535.) In 1982, by enactment of the Reclamation Reform Act (43 U.S.C. § 390aa et seq.) (RRA), "'Congress redefined completely who could receive subsidized reclamation water and the price they would pay.' [Citation.] The 160-acre limitation 'was discarded as incompatible with modern farming techniques. In its place, Congress authorized the sale of project water at the new, though still subsidized, rates to "qualified recipients" for land holdings up to 960 acres and to "limited recipients" for land holdings up to 320 acres.'" (*Natural Resources Defense Council*, at p. 1535.) The acreage limitation "has remained, on one hand, an unpopular provision among large landholders who do not want limits on their land, particularly in the Central Valley, where large industrial farms are more common than other areas of the West. On the other hand, it has been a key rallying point for taxpayer groups, environmentalists, and others who have opposed using federally subsidized

11.

In March 2019, the Bureau gave notice in the federal court action that it "'no longer intend[ed] to pursue the issuance of new long-term water service contracts to Westlands under the authority of [the] CVPIA'" but did intend to "'convert Westlands' existing water service contracts into repayment contracts'" as authorized by the WIIN Act. Approximately one year later, on or about February 28, 2020, Westlands and the Bureau executed an agreement labeled contract No. 14-06-200-495A-IR1-P and entitled "Contract Between the United States and Westlands Water District Providing For Project Water Service San Luis Unit and Delta Division and Facilities Repayment" (underscoring and some capitalization omitted; hereafter the "WIIN Act contract").

The WIIN Act contract refers to a previously "Existing Contract," i.e., the sixth interim renewal contract between Westlands and the Bureau (contract No. 14-06-200-495A-IR6), and it converts that water service contract to a repayment contract. Although executed in February 2020, the terms of the WIIN Act contract postponed its effective date until June 1, 2020. Due to the expiration of the prior "Existing Contract" on February 29, 2020, Westlands and the Bureau entered into a seventh interim renewal contract (contract No. 14-06-200-495A-IR7), to cover the period of March 1, 2020 through May 31, 2020. On June 11, 2020, after the WIIN Act contract had taken effect, Westlands made a "payment of $209,436,667" to the Bureau "to pay off Westlands' capital repayment obligation for the construction of CVP facilities." (This quoted

---

water to irrigate large swaths of land." (Stern, *Accelerated Repayment of Bureau of Reclamation Construction Costs*, *supra*, at p. 1.)

The WIIN Act did not eliminate the acreage limits, but it did provide a mechanism for obtaining benefits historically available through repayment contracts but not water service contracts. (See WIIN Act, § 4011(c)(1); 42 U.S.C. § 390mm.) "[O]nce a repayment contract is paid out, contractors continue to receive project benefits but are no longer subject to the 960-acre limit or to other provisions of RRA (e.g., full-cost pricing for water under certain circumstances). However, under water service contracts, the acreage limitation and other requirements of reclamation law continue, unless otherwise exempted by law." (Stern, *Accelerated Repayment of Bureau of Reclamation Construction Costs*, *supra*, at p. 1.)

12.

statement is taken from a declaration in the record signed by Westlands' chief operating officer in September 2021.)

Execution of the WIIN Act contract between Westlands and the Bureau did not resolve the federal court action. Although claims pertaining to the earlier interim renewal contracts were dismissed, the plaintiffs were permitted to amend their complaint to assert claims regarding the WIIN Act contract. (*North Coast Rivers Alliance v. U.S. Dept. of Interior* (E.D.Cal. Aug. 12, 2022, No. 1:16-cv-00307-JLT-SKO) [2022 U.S. Dist. LEXIS 144401, p. *7; 2022 WL 4126085, p. *2] [order denying Bureau's motion to stay action pending rulings in "several similar though not identical [federal] cases concerning WIIN Act Repayment Contracts"].) As of July 2023, the case is active and pending.

***The Present Matter***

To fully explain the context in which this case arose, we briefly discuss one more aspect of federal reclamation law. "In 1922, Congress enacted legislation expanding the United States' options to allow it to contract not only with individual water users, but also with 'any legally organized irrigation district.' [Citation]." (*San Luis Unit Food Producers v. U.S.* (E.D.Cal. 2011) 772 F.Supp.2d 1210, 1233.) The century-old law provides, in relevant part, "That no contract with an irrigation district under this Act shall be binding on the United States until the proceedings on the part of the district for the authorization of the execution of the contract with the United States shall have been confirmed by decree of a court of competent jurisdiction, or pending appellate action if ground for appeal be laid." (43 U.S.C. § 511.)

In short, federal reclamation contracts with irrigation districts "are not binding upon the United States unless and until they are validated by state court decree." (*Hoopa Valley Tribe v. U.S. Bureau of Reclamation*, *supra*, __ F.Supp.3d at p. __, citing 43 U.S.C. § 511 [2022 U.S. Dist. LEXIS 232992, *3; 2022 WL 17994327, *1].) Recitals of this principle appear to be standard, or at least common, in contracts between the Bureau and water contractors like Westlands. Such a provision was included in the 1963 contract

between Westlands and the Bureau. The WIIN Act contract likewise contains, in a paragraph labeled Article 47, the following language:

> "Promptly after the execution of this amended Contract, the Contractor [Westlands] will provide to the Contracting Officer [the Bureau] a certified copy of a final decree of a court of competent jurisdiction in the State of California, confirming the proceedings on the part of the Contractor for the authorization of the execution of this amended Contract. This amended Contract shall not be binding on the United States until the Contractor secures a final decree."

This appeal concerns Westlands' failed attempt to satisfy the above-quoted provision, which was originally labeled as Article 46 in the draft version of the contract presented to the superior court below. However, as Westlands has previously acknowledged, case law holds that "[e]ven if the United States is not bound by the [repayment] contract because it was not judicially confirmed, the contract is not necessarily invalid." (*Concerned Irrigators v. Belle Fourche Irr. Dist.* (8th Cir. 2001) 235 F.3d 1139, 1144.) Put differently, "'even when an executed water repayment contract may be voidable by one party, *this does not mean that it is void*.'" (*Hoopa Valley Tribe v. U.S. Bureau of Reclamation*, *supra*, __ F.Supp.3d at p. __ [2022 U.S. Dist. LEXIS 232992, *7; 2022 WL 17994327, *3].)

Westlands is appealing from a judgment of dismissal, not a judgment that determines the validity or legality of the WIIN Act contract. (See *Olwell v. Hopkins* (1946) 28 Cal.2d 147, 149 ["Ordinarily, a judgment of dismissal is not a judgment on the merits"].) Westlands and the Bureau have been performing under that contract for the past three years. The Bureau accepted Westlands' lump sum repayment of its capital costs obligation, and the Bureau continues to defend the contract in federal court. As noted in a related case, "there is no suggestion that the United States disclaims its contractual obligations to Westlands (or any other WIIN Act repayment contract holder)." (*Hoopa Valley Tribe v. U.S. Bureau of Reclamation*, *supra*, __ F.Supp.3d at p. __ [2022 U.S. Dist. LEXIS 232992, *9; 2022 WL 17994327, *4].) The Bureau has

14.

reportedly taken the position that the WIIN Act contract "'will govern the rights and obligations of the United States and [Westlands] … notwithstanding [Westlands'] inability to obtain a final decree confirming its proceedings to authorize the execution of [the WIIN Act contract].'" (*Ibid*.) It is thus unclear what practical effect, if any, the outcome of this appeal may have on the contractual relationship between Westlands and the Bureau. With that being said, we now summarize the underlying proceedings.

On October 25, 2019, Westlands filed a validation complaint in the Fresno Superior Court pursuant to Code of Civil Procedure section 860 et seq., Government Code section 53510 et seq., and Water Code section 35855. The complaint named as defendants "All Persons Interested in the Matter of the Contract Between the United States and Westlands Water District Providing for Project Water Service, San Luis Unit and Delta Division and Facilities Repayment." (Some capitalization omitted.) Service of the complaint and summons was accomplished by publication. The summons stated, in relevant part: "All persons interested in this matter may contest the legality or validity of the matter by appearing and filing a written answer to the complaint not later than December 16, 2019."

As explained above, the WIIN Act contract was not executed until February 28, 2020, i.e., four months after the validation action was filed. An unsigned and unfinalized draft version of the contract was attached to the complaint as an exhibit. Also attached was a copy of "Resolution No. 119-19," memorializing actions taken by Westlands' Board of Directors (Board) at a meeting held on October 15, 2019. The Board had authorized execution of the anticipated WIIN Act contract "in substantially the form presented to [it]," i.e., in substantially the same form as the draft attached to the validation complaint, "with such additional changes and/or modifications as are approved by the President of [Westlands], its General Manager, and its General Counsel." The Board further authorized the issuance of notices of exemption from CEQA.

Westlands' validation complaint included the following prayer for relief:

15.

"That judgment be entered determining that: (a) the Converted Contract, [i.e., the draft attached as an exhibit] and *each and every provision* of said Converted Contract, is valid under applicable California law; (b) that [Westlands] has, and at all times relevant has had, the authority to enter into said Converted Contract under California Water District Law, including Water Code sections 35851 and 35875; (c) that all of the proceedings of [Westlands] and its Board of Directors leading up to and including the making and approval of said Converted Contract were in all respects legal and valid; (d) that said Converted Contract is *in all respects* valid under applicable California law and *binding upon the respective parties thereto*; and (e) that said Converted Contract, *and each and every provision thereof*, is, and are, in all respects valid and authorized by applicable California law." (Italics added.)

Respondents collectively filed four verified answers to the complaint. Together they asserted dozens of "affirmative defenses," the most pertinent of which were as follows.

Nearly all respondents characterized the lawsuit as premature. They claimed the Bureau had not yet completed its "review and decision-making" on the matter and had "extended an initial 60-day comment period on Westlands' 'draft repayment contract' until January 8, 2020." In related contentions, respondents County of San Joaquin and County of Trinity (hereafter Counties) asserted that "Westlands' haste to approve and validate a converted contract appears to be prompted, at least in part, to moot [the claims in the federal court action] over environmental review of its [sixth interim renewal contract with the Bureau]."

The group of respondents led by North Coast Rivers Alliance alleged the actions taken by Westlands' Board violated state and federal environmental laws. Those respondents further alleged violations of the Ralph M. Brown Act (Gov. Code, § 54950 et seq.) (Brown Act), specifically claiming that "[n]one of the Exhibits to the Contract were provided to the public, preventing informed public review and comment."

The Counties also focused on the missing exhibits, but for a different reason, alleging their absence rendered the working draft "materially incomplete." The Counties

16.

noted that "[t]imelines relating to Westlands' payment obligations" could not be determined because the relevant provisions contained bracketed "placeholder references," e.g., a sentence reading, "The Repayment Obligation is due in lump sum by **[Month Day, Year]** as provided by the WIIN Act." The amount of Westlands' repayment obligation was purported to be set forth in an exhibit ("Exhibit D"), but none of the exhibits referenced in the draft were attached to the complaint.

On December 30, 2019, Westlands filed a "Motion for Validation of Contract," seeking entry of a judgment in its favor on all issues (hereafter the "December 2019 motion"). The motion was partially supported by the declaration of Balbina Ormonde, Westlands' "Deputy General Manager of Finance & Administration and Secretary." The general purpose of her declaration and its attachments was to show compliance with the Brown Act.

The December 2019 motion was also supported by the (first) declaration of Jose Gutierrez, Westlands' Chief Operating Officer. The Gutierrez declaration explained that Westlands had contacted the Bureau in April 2018 to request conversion of its then existing water service contract (the sixth interim renewal contract) to a repayment contract pursuant to the WIIN Act. The declaration also addressed the issue of the missing exhibits (original text broken into smaller paragraphs for readability):

> "There will be four exhibits to the Converted Contract. Although the Bureau of Reclamation has not yet finalized the exhibits, each exhibit is described in the Converted Contract and three of the four exhibits remain as they are within the existing water service contract.

> "Exhibit A to the Converted Contract will be a map of the Westlands Water District service area. The service area will be the same as illustrated in the map that Exhibit A to Westlands' existing water service contract [*sic*].

> "Exhibit B to the Converted Contract will be a listing of the rates and charges applicable to Westlands upon execution of the Converted Contract. As is set forth in the Converted Contract and consistent with the requirements of the existing water service contract, the rates and charges

17.

will be updated annually, as calculated by the Bureau of Reclamation to meet the requirements of reclamation law.

"Exhibit C to the Converted Contract will be a document explaining the purpose and methodology of water needs assessments performed by the Bureau of Reclamation. This document will be the same as the Exhibit C to Westlands Water District's existing water service contract.

"Exhibit D to the Converted Contract is the only new exhibit. It will be a document showing the amount of Westlands' repayment obligation as of the date it enters the Converted Contract. The obligation is determined through a ministerial calculation by the Bureau of Reclamation based on reclamation law and policy. In a June 18, 2018 letter, as required by the WIIN Act, the Bureau of Reclamation informed Westlands that its then existing repayment obligation was approximately $362,079,612. Westlands anticipates that the total amount of its repayment obligation that will be included in Exhibit D to the Converted Contract will be lower than the estimate it was provided in 2018, because over the course of the last approximate 18 months, Westlands has continued to make payments towards its share of the CVP's capital costs. Exhibit D could not be provided until the date of execution is known."[4]

Respondents collectively filed four oppositions to the December 2019 motion, with most arguing the draft agreement was materially incomplete. The Counties alleged that the absence of exhibit D was "[p]articularly alarming" in light of "a history of differing views of what Westlands would owe under the conversion contract." North Coast Rivers Alliance similarly argued that the "amount of Westlands' existing capital obligation is an essential contract term, … [b]ut nowhere in the Converted Contract does Westlands disclose how much money it must pay to the Bureau."

On January 21, 2020, Westlands filed replies to the opposition papers, along with a second declaration of Jose Gutierrez. The latter document contained the following statements:

---

[4]The estimate allegedly provided by the Bureau in June 2018 was not otherwise substantiated, though it appears the date of "June 18, 2018" was a typographical error and the correct date was June 29, 2018. However, as discussed *post*, it is unclear how the declarant concluded the repayment obligation specific to Westlands' sixth interim renewal contract was in excess of $362 million based on the information provided in the Bureau's June 2018 letter.

"In my prior declaration, I referenced a letter from [the Bureau] to Westlands, dated June 29, 2018. I explained that Exhibit D to the Converted Contract will consist of a current update of the repayment obligation listed in that letter, but this updated amount cannot be provided until the date of contract execution is known since Westlands continues to make payments on its share of capital costs. A true and correct copy of the June 29, 2018 letter is attached hereto …. [The Bureau's] estimate of Westlands' capital repayment obligation was known and discussed with the Westlands Board of Directors well before the October 15, 2019 meeting in which the Westlands Board of Directors approved the Converted Contract.

"[The Bureau] will calculate the capital repayment obligation amount. It is not an item that is to be negotiated between Westlands and [the Bureau]."

The June 2018 letter referenced in, and attached to, the second declaration of Jose Gutierrez consisted of two pages of correspondence and three pages of enclosures. The subject line of the Bureau's letter referenced not only the sixth interim renewal contract with Westlands (contract No. 14-06-200-495A-IR6), but also six other contracts—many of which were between the Bureau and Westlands DD #1 and Westlands DD #2.[5] The letter did not contain a specific repayment estimate, but instead advised that multiple "water service contracts … currently have estimated unpaid costs for construction as outlined in the enclosed schedules." It was noted the estimated costs took into account "water service construction costs currently being allocated to Westlands Water District that are unpaid as of September 30, 2016."

The enclosures to the Bureau's June 2018 letter provided repayment estimates specific to certain contractors, facilities, and contracts. The first page identified the

---

[5]Several of the additional contracts referenced in the Bureau's June 2018 letter were the subject of separate validation actions filed by Westlands DD #1 and Westlands DD #2 in Fresno Superior Court cases Nos. 20CECG01011 and 20CECG01012, respectively. The distribution districts have filed appeals in those cases, and the appeals are currently pending before this court in cases Nos. F084291 and F084294. The Counties, along with respondent South Delta Water Agency, have jointly filed a request for judicial notice of certain rulings by the Fresno Superior Court in those cases. The unopposed request is hereby granted. We note those same cases are discussed by Westlands in footnote 2 of its opening brief in the present appeal.

contractor as "Westlands Water District," the facility as "Delta Mendota Pool," and the contract as "14-06-200-495A-IR6," i.e., the sixth interim renewal contract. This document provided a lump sum repayment estimate of $1,520,987 and an installment estimate of $1,579,414 (four equal payments of $394,853).

The second page of enclosures facially pertained to contractor "Westlands Water District DD #1," identified the facility as "San Luis Canal," and referenced contracts "14-06-200-495A-IR6 [the sixth interim renewal contract], 14-06-200-7823J, 14-06-200-8092-IR16, 7-07-20-W0055-IR16-B[,] 14-06-200-8018-IR16-B, [and] 14-06-200-365A-IR16[.]" This document provided a lump sum repayment estimate of $320,445,400 and an installment estimate of $332,754,826 (four equal payments of $83,188,707).

The third page of enclosures facially pertained to contractor "Westlands Water District DD #2," identified the facility as "San Luis Canal," and the contract as "14-06-200-336C-IR16." This document provided a lump sum repayment estimate of $531,258 and an installment estimate of $551,666 (four equal payments of $137,916).[6]

For reasons not explained by the record, the superior court postponed the motion hearing from the original date of January 28, 2020, until February 27, 2020. Westlands filed an ex parte application to advance the hearing date, noting its sixth interim renewal contract with the Bureau was set to expire on February 29, 2020. The application was denied.

---

[6]As stated in footnote 4, *ante*, it is unclear how Westlands interpreted the Bureau's June 2018 letter and its three pages of enclosures as providing a repayment estimate of $362,079,612 to convert the sixth interim renewal contract to a repayment contract. One might assume the calculation was based on all three enclosures, notwithstanding the references to multiple contractors and multiple contracts, but even with that assumption the numbers do not add up. The total lump sum estimate across all three enclosures was only $322,497,645, and the combined installment estimate was $334,885,906. The combined sum of the *unadjusted* total costs on all the three pages (i.e., the unpaid costs prior to applying the discount rate used to calculate the repayment estimates) comes out to $361,813,667. The latter figure is $265,945 less than the estimate provided in the first declaration of Jose Gutierrez, though the difference may be explained by separately listed "M&I [Municipal & Industrial] Construction Costs" apparently owed by Westlands DD #1.

20.

On February 25, 2020, Westlands notified the superior court of its intention to "execute the Converted Contract on February 28, 2020," i.e., the day after the motion hearing, adding that the contract would have an effective date of June 1, 2020. The statement continued: "To provide for continued water service between March 1, 2020 and the effective date of the Converted Contract, Westlands and the United States will enter into an additional [i.e., seventh] interim renewal contract (Contract No. 14-06-200-495A-IR7)."

On February 26, 2020, the superior court issued a written tentative ruling to deny the December 2019 motion. The motion was argued the following day, at which time counsel for Westlands advised that it still intended to execute the anticipated WIIN Act contract as scheduled. The remarks prompted the following exchange:

> "THE COURT: This a $362 million contract?
>
> "[WESTLANDS' COUNSEL]: The final payment amount, Your Honor, is—the repayment obligation for construction is significantly less than that because the years between that estimate and today, Westlands has been making payments and—
>
> "THE COURT: About how much less? I'm sorry to interrupt you.
>
> "[WESTLANDS' COUNSEL]: I'm sorry, Your Honor. It's—I don't have the precise—it's in the $200 million range."[7]

---

[7]In Westlands' original moving papers, it claimed that neither exhibit D nor the information therein could be provided until the date of contract execution was known. Westlands has since asserted, including in its reply brief on appeal, that "the specific dollar amount of [its] repayment obligation could not be calculated until the *effective* date of [the] contract was known." (Italics added.) Westlands' current position, which was reasserted by its counsel during oral argument, aligns with correspondence in the record between Westlands and the Bureau. However, the draft agreement attached to the validation complaint specified an effective date of March 1, 2020. The effective date was later changed, but the record indicates Westlands and the Bureau had agreed to both the execution date and effective date of the WIIN Act contract by February 25, 2020. As such, it is unclear to this court why Westlands was unable to provide a copy of exhibit D, or disclose the information therein, on or before the hearing date of its December 2019 motion.

21.

Westlands' counsel proposed "to submit for the Court's information a copy of the executed converted contract" at some later point in time, i.e., "perhaps ten court days" from the date of the hearing.  The Counties' attorney made these arguments in opposition:

> "The subject of a validation action can only be the contract that is tendered before the Court, which as your Your Honor [*sic*] has pointed out here is missing the four exhibits and is subject to change at the [B]ureau and a number of uncertain developments at the federal level.  Whether a conversion contract is going to be executed in another day, or another month, or another year, it means there is going to be a different contract document that is not before the Court in any form [and] that was not the basis for the summons that was published and was the source of jurisdiction here ….  [S]o it helps them not at all to say that there may be a subsequent converted contract."

The hearing concluded with the motion being taken under submission.  Westlands' proposal to submit a copy of the executed WIIN Act contract on a later date was impliedly rejected.  On March 16, 2020, the superior court issued a minute order adopting its tentative ruling.

The December 2019 motion was denied on three grounds.  First, the superior court interpreted Water Code section 35855 as authorizing validation actions only for executed contracts, not "proposed" contracts.[8]  The court observed that proposed contracts may be validated under Government Code section 53511, but only if they """are in the nature of, or directly relate to a public agency's bonds, warrants or other evidences of indebtedness.""""  (Quoting *Santa Clarita Organization for Planning & Environment v.*

_____

[8]Water Code section 35855 provides:  "An action to determine the validity of any contract may be brought pursuant to [Code of Civil Procedure section 860 et seq.]."  The Superior Court noted that earlier versions of the statute had expressly authorized validation actions concerning any contract or "*proposed contract*" between a water district and another public agency.  (Italics added.)  Citing *Gikas v. Zolin* (1993) 6 Cal.4th 841, the court reasoned that deletion of the term "proposed contract" meant the statute was now limited in scope to executed contracts.  (See *id*. at p. 861 ["""The rejection by the Legislature of a specific provision contained in an act as originally introduced is most persuasive to the conclusion that the act should not be construed to include the omitted provision"""].)

*Castaic Lake Water Agency* (2016) 1 Cal.App.5th 1084, 1099.)  The proposed contract between Westlands and the Bureau was found to concern the repayment of a debt only in part.  Therefore, as somewhat clarified in a later ruling (see further discussion, *post*), the court seemingly believed it was unable to consider for validation the "provisions unrelated to debt."

Second, the so-called "proposed contract" was held to lack certain essential terms.  The written decision noted "Exhibits A, B, C, and D to the Converted Contract [were] missing from all materials submitted to the Court.  Exhibit D is the repayment page."  The analysis continued:

> "The proposed judgment seeks a ruling that 'the Converted Contract is in all respects valid under applicable California Law and binding upon Westlands.'  Given that the contract terms, including repayment terms, are not certain, and that [Westlands' Board authorized] that the contract may be changed or modified, validation is not appropriate.  It is not possible to make the determinations sought where no final contract is presented for validation.
>
> "Westlands' Declarant Gutierrez states he does not anticipate any major changes, but the validation statutes do not encompass judicial approval of incomplete contracts.  Given the estimate for the repayment amount is over $362,000,000 [citation], the absence of the actual final amount and payment schedule render the proposed contract lacking in material terms and incomplete."

Third, Westlands was deemed to have fallen short of meeting its evidentiary burden, as the moving party, to demonstrate compliance with the Brown Act.  The superior court found conflicts in Westlands' own evidence regarding notice requirements for the October 2019 Board meeting, and further noted the absence of certain evidence that would have shown whether "the information necessary to support the meeting" had been provided to the public.[9]

---

[9]Westlands has repeatedly complained that "[n]one of these … specific Brown Act related issues [were] raised by Respondents in their oppositions …; they were raised only *sua*

23.

The superior court also ruled that three of the four answers to the complaint were not timely filed—agreeing with a contention Westlands had vigorously argued in its moving papers. The affected parties appealed that portion of the ruling, which resulted in a stay of the proceedings from approximately August 2020 through May 2021. The findings of untimeliness were reversed by this court. (*Westlands Water Dist. v. North Coast Rivers Alliance* (Mar. 9, 2021, F081174) [nonpub. opn.]; *Westlands Water Dist. v. County of San Joaquin* (Mar. 9, 2021, F081181) [nonpub. opn.]; *Westlands Water Dist. v. California Water Impact Network* (Mar. 9, 2021, F081182) [nonpub. opn.].)

The discretionary stay was ordered while a "Renewed Motion for Validation of Contract" was pending. However, the motion was filed only three weeks prior to the stay, and it was never heard or ruled upon. Instead, following a July 2021 status conference, the parties were ordered to submit "opening" and "cross-opening" briefs.

In September 2021, Westlands filed notice of another "Renewed Motion for Validation Judgment" (hereafter the September 2021 motion), along with a combined "Opening Brief and Memorandum of Points and Authorities in Support of Renewed Motion for Validation Judgment." An attorney declaration identified the "new or different facts" (Code Civ. Proc., § 1008, subd. (b)) supporting the motion as consisting of (1) execution of the WIIN Act contract in February 2020; (2) the Westlands Board's "adoption of Resolution 110-21 [on June 15, 2021,] confirming that the execution and delivery of [the WIIN Act contract] conformed fully with the authority granted by the Westlands Board in Resolution No. 119-19"; and (3) "[i]nformation responsive to specific questions regarding Brown Act compliance raised [in the ruling on the December 2019 motion]." Westlands also provided 63 pages of legislative history materials to refute the superior court's interpretation of Water Code section 35855.

*sponte* by the trial court in its tentative ruling issued the day before the hearing on [the December 2019] motion."

24.

The Board's "Resolution No. 110-21" essentially states, in relevant part, that its actions in October 2019 were taken despite not knowing the contents of exhibit D because of its understanding and belief that Westlands' repayment obligation would be less than the estimate "presented in connection with [the Board's review of the draft agreement]." The amount of the prior estimate is not disclosed. The resolution further declares that all differences between the WIIN Act contract and the earlier draft "are consistent and in full conformity with and within the scope of the authorization and direction provided by the Board … pursuant to Resolution No. 119-19."

Westlands' moving papers included copies of what it identified as the final, "fully executed Converted Contract," i.e., the WIIN Act contract. One copy was attached to the Board's resolution No. 110-21. Another copy was attached to an updated declaration of Jose Gutierrez, dated September 17, 2021. Both attachments included a letter from the Bureau to Westlands, dated February 28, 2020, enclosing a copy of the executed WIIN Act contract and noting that, "Exhibit D to the Contract will be finalized on the Effective Date of the Contract, [i.e., June 1, 2020,] in accordance with the [WIIN Act]." However, the copy attached to resolution No. 110-21 has a *different version* of exhibit D than the copy attached to the (fourth) Gutierrez declaration. Both versions consist of two pages closely resembling (in format) the enclosures to the Bureau's June 2018 letter, i.e., the one relied upon by Jose Gutierrez to estimate Westlands' repayment obligation in 2019.

In the version attached to resolution No. 110-21, the first page of exhibit D facially pertains to contractor "Westlands Water District DD #1," identifies the facility as "San Luis Canal," and references contract Nos. "14-06-200-0495A-IR1-P [the WIIN Act contract]," "7-07-20-W0055B-IR5-P," "14-06-200-8092-IR5-P," and "14-06-200-8018B-IR5-P." This first page calculates a lump sum option of $208,182,333, an installment option of $211,366,768 (four equal payments of $52,841,692), and separately lists an "M&I [Municipal & Industrial] Construction Cost" obligation of $264,913. The second page identifies the contractor as "Westlands Water District," the facility as "Delta

25.

Mendota Pool," and references contract No. "14-06-200-0495A-IR1-P [the WIIN Act contract]." The lump sum option is $535,596 and the installment option is $543,789 (four equal payments of $135,947).

The version of exhibit D attached to the (fourth) Gutierrez declaration is truncated, and thus partially illegible, on the right side and bottom portions of both pages. The first page facially pertains to contractor "Westlands Water District DD #1," identifies the facility as "San Luis Canal," and references contract Nos. "14-06-200-0495A-IR1-P [the WIIN Act contract], 14-06-200-7823J-LTR1-P, 14-06-200-8092-IR5-P, 7-07-20-W0055B-IR5-P, 14-06-200-8018B-IR5-P, [and] 14-06-200-3365AB-IR5-P." The lump sum option is calculated to be $204,635,193, the installment option is $209,285,920 (four equal payments of $52,321,480), and the "M&I Construction Cost" is separately listed as $264,913. The second page identifies the contractor as "Westlands Water District," the facility as "Delta Mendota Pool," and references contract No. "14-06-200-0495A-IR1-P [the WIIN Act contract]." The lump sum option is $519,163 and the installment option is $530,962 (four equal payments of $132,740).

Respondents opposed the September 2021 motion, with all arguing it was either untimely or sought relief beyond the scope of the complaint. In other words, a motion for reconsideration of the March 2020 ruling was subject to a 10-day deadline. (Code Civ. Proc., § 1008, subd. (a).) If Westlands was renewing the prior motion based on the new or different facts identified in the moving papers, then the relief sought was validation of a different contract. The Counties, for example, accused Westlands of employing "a 'bait and switch' strategy, attempting to conjure 'new' facts from a materially different contract adopted months later and a different resolution adopted more than a year and a half later." The Counties further argued, "The resolution and contract defining the *res* in this validation action have remain unchanged since October 2019. None of Westlands' postauthorization fixes can validate the materially deficient contract framing the complaint and summons."

The superior court issued a written tentative ruling to deny the motion. The motion was heard on October 27, 2021, and taken under submission. The tentative ruling was later adopted in full.

The superior court ruled that none of Westlands' "purportedly new facts" supported the September 2021 motion. In reaching this conclusion, the court generally agreed with the position articulated by the Counties. The written decision explains:

> "The fact that Westlands and the Bureau entered into a final version of the repayment contract <u>after</u> the hearing on the [December 2019 motion] does not affect the issues pointed out in [the court's] order denying the [motion]. As [the court] held, the contract considered by the Board in October 2019 was only a proposed, incomplete contract, because it lacked key terms like the final repayment price and the dates on which repayments would be due. … Although the contract was later finalized and executed by the parties, <u>the issue before the court</u> was whether the Board acted properly when it approved the contract in October 2019, not whether the contract was later executed by the parties.…
>
> "Likewise, the fact that the Board approved a resolution in June 2021 stating that the executed contract conformed to the authority granted by the Board's prior resolution does not affect [the court's] conclusion that the contract considered by the Board in October of 2019 was not a complete contract. Again, [the court] found that the contract considered by the Board in October 2019 was incomplete and uncertain because it lacked key terms …. The Board's <u>subsequent</u> resolution that the final contract was consistent with its earlier resolution does not cure these deficiencies …. The issue before the court is whether the Board's decision to approve the contract in October of 2019 was valid, not whether it later made subsequent resolutions that attempted to cure earlier deficiencies in the draft contract." (Original underscoring.)

Regarding compliance with the Brown Act, Westlands' "'new facts'" were found to be "events that occurred in October 2019, long before the hearing on the [December 2019 motion]." It was further held that Westlands failed "to explain why it could not have presented these facts at the time of the original hearing, and it appears that it could have done so, since the evidence was apparently in its possession at that time." (See *Even Zohar Construction & Remodeling*, *Inc. v. Bellaire Townhouses*, *LLC* (2015) 61

27.

Cal.4th 830, 839 ["Courts have construed [Code of Civil Procedure] section 1008 to require a party filing an application for reconsideration or a renewed application to show diligence with a satisfactory explanation for not having presented the new or different information earlier"].)

"Finally, to the extent that Westlands request[ed] that the court grant a validation judgment as to the parts of the contract" at issue, the request was denied. The superior court clarified that its ruling on the December 2019 motion "did not find that some portions of the contract could be validated." "The order instead found that, while some portions of the contract related to repayment of an indebtedness, and thus were potentially subject to being validated, the Board's decision nevertheless could not be properly validated because it had sought to validate an incomplete, uncertain, proposed contract."

The order adopting the tentative ruling included an order to show cause (OSC) as to why the action should not be dismissed. An OSC hearing was held in December 2021, at which time Westlands' counsel opposed dismissal but conceded an entry of judgment in its favor would be inconsistent with the superior court's recent findings and conclusions. The hearing was continued to February 2022 pending consideration of whether respondents were entitled to affirmative relief, i.e., a judgment in their favor and against Westlands.[10]

---

[10]Westlands' counsel argued the absence of any cross-complaints effectively precluded entry of a judgment against Westlands on the merits. The argument was based on Code of Civil Procedure section 431.30. As a general rule, if a defendant seeks affirmative relief in its favor, the defendant "must file a cross-complaint, because section 431.30, subdivision (c), bars it from claiming affirmative relief by way of the answer." (*Construction Protective Services*, *Inc. v. TIG Specialty Ins. Co*. (2002) 29 Cal.4th 189, 198; see *City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 746, fn. 12 ["'Affirmative relief' is an award, such as damages, that goes beyond merely defeating the plaintiff's recovery"].)

Respondents eventually submitted a proposed judgment of dismissal. It was adopted and signed by the superior court on March 15, 2022. Westlands filed a timely appeal.[11]

**DISCUSSION**

## I. Validation Actions

"Generally speaking, statutory validation actions are designed to provide expedient, uniform procedures by which public agencies can obtain binding judgments as to the validity of public financing commitments such as 'bonds, warrants, contracts, obligations or evidence of indebtedness ….'" (*City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 66, fn. 12.) "They are expedited because they require validation proceedings to be filed within 60 days of the public agency's action (Code Civ. Proc., §§ 860, 863) [and] are 'given preference over all other civil actions' (*id*., § 867)." (*Santa Clarita Organization for Planning & Environment v. Castaic Lake Water Agency*, *supra*, 1 Cal.App.5th at p. 1096.) "They are definitive because they are in rem proceedings that … result in a judgment that is 'binding … against the world' [citations], and cannot be collaterally attacked, even on constitutional grounds [citations]." (*Ibid.*)

"'This procedure, which the Legislature codified as Code of Civil Procedure sections 860 through 870, does not, in itself, authorize any validation actions; rather, it establishes a uniform system that other statutory schemes must activate by reference.' [Citation.] Therefore, if no statute authorizes use of the validation statutes to test a

---

[11]On November 8, 2021, the Counties filed a "Notice of Entry of Judgment or Order" regarding the September 2021 motion ruling. On December 7, 2021, Westlands, "in an abundance of caution in response to the notice of entry," filed a notice of appeal, thereby initiating case No. F083632. Westlands filed a second notice of appeal on March 29, 2022, following entry of the judgment of dismissal two weeks earlier, thereby initiating case No. F084202. On May 6, 2022, this court granted Westlands' unopposed motion to consolidate F084202 with F083632 for all purposes.

29.

particular type of agency matter, then the validation statutes do not apply." (*Davis v. Fresno Unified School Dist.*, *supra*, 14 Cal.5th at pp. 684–685.)

Westlands relied on provisions in the Water Code and Government Code to invoke the validation procedures of Code of Civil Procedure section 860 et seq. We conclude jurisdiction was established under Government Code section 53511 (see *post*). Since authorization under the Government Code was sufficient, we need not address the superior court's interpretation of Water Code section 35855.

Government Code section 53511, subdivision (a) provides: "A local agency may bring an action to determine the validity of its bonds, warrants, contracts, obligations or evidences of indebtedness pursuant to [Code of Civil Procedure section 860 et seq.]." The term "contracts" is limited in scope to "contracts that somehow relate to government indebtedness." (*Davis v. Fresno Unified School Dist.*, *supra*, 14 Cal.5th at p. 689.) A contract meets the standard "if it is inextricably bound up with government indebtedness or with debt financing guaranteed by the agency." (*Id*. at p. 691.) Put differently, "the contract must be one on which the debt financing of the project directly depends." (*Ibid*.)

Under the validation statutes, contracts "shall be deemed to be in existence upon their authorization[,] … and contracts shall be deemed authorized as of the date of adoption by the governing body of the public agency of a resolution or ordinance approving the contract and authorizing its execution." (Code Civ. Proc., § 864.) Therefore, the fact the draft agreement attached to Westlands' complaint was undated and unsigned is largely immaterial. There is no denying it was "inextricably bound up with government indebtedness." (*Davis v. Fresno Unified School Dist.*, *supra*, 14 Cal.5th at p. 691).) However, recognizing the draft agreement was a contract then in existence is wholly separate from the issue of whether, as Westlands sought to establish, the contract was "in all respects valid under applicable California law and binding upon the respective parties thereto."

"It must be reiterated that the finding of 'existence' of a contract, as defined in Code of Civil Procedure section 864, has no bearing on the question of *validity* or enforceability of that contract under the applicable laws." (*Smith v. Mt. Diablo Unified Sch. Dist.* (1976) 56 Cal.App.3d 412, 417.)

## II.    Claims on Appeal

Westlands contends the "authorization to execute the proposed contract in substantially the form presented to the Westlands Board on October 15, 2019, rendered the contract 'in existence'" at that time. As we understand the argument, Westlands claims the contract then in existence was not the draft version attached to the complaint, but the WIIN Act contract executed four months later, because there are no material differences between the two instruments. Whether the claim has merit depends on the importance of the exhibits missing from the draft, which is the ultimate issue decided herein.

Focusing on the absence of exhibit D, Westlands argues the amount of its repayment obligation was a "ministerial detail." It attempts to recast the issue as one hinging on its Board's ability to "delegate[] authority to the Westlands' President to finalize and execute" the contract once the specific amount was known. (See Wat. Code, § 35406, subd. (b) ["The board of a district may delegate and redelegate to officers … the power to bind the district by contract and execute contracts on behalf of the district"].) Westlands also devotes large portions of its briefing to the Brown Act issues, emphasizing the statutory presumption of duty regularly performed (Evid. Code, § 664).

Contingent on our rejection of its first set of arguments, Westlands further claims the superior court erred by denying its September 2021 motion. The rest of its briefing addresses a multitude of other arguments made by respondents in their oppositions below but not reached by the superior court in its rulings. Respondents have renewed those arguments on appeal contingent upon our acceptance of Westlands' claims regarding the

31.

December 2019 and/or September 2021 motion rulings. For example, respondents allege Westlands failed to comply with the Sacramento-San Joaquin Delta Reform Act of 2009 (Wat. Code, § 85000 et seq.) and violated the public trust doctrine (see *National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 433–441 [explaining the relevant concepts].)

As we agree with the superior court's conclusion regarding the lack of essential terms, and its rationale for denying the September 2021 motion, we need not decide any of the parties' remaining contentions. (See *Katz v. Campbell Union High School Dist.* (2006) 144 Cal.App.4th 1024, 1032 ["the validity of a matter is not decided piecemeal"]; *N.T. Hill Inc. v. City of Fresno* (1999) 72 Cal.App.4th 977, 991, fn. 10 ["The validation statutes require consolidation of all challenges to a particular governmental action and entry of a single judgment"].)

## III.  Analysis

### A.  December 2019 Motion Ruling

The issue is whether the absence of exhibit D from the contract attached to the complaint rendered it materially deficient and uncertain. Put differently, did the failure to specify Westlands' financial obligations preclude a judicial determination, as sought by the complaint, that the contract was "in all respects valid under applicable California law and binding upon the respective parties thereto," i.e., enforceable?

The relevant principles are summarized in *Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199:

> "'Under California law, a contract will be enforced if it is sufficiently definite (and this is a question of law) for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached.' [Citation.] 'To be enforceable, a promise must be definite enough that a court can determine the scope of the duty[,] and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages.' [Citations.] … 'The terms of a contract are reasonably certain if they provide a basis for determining the

32.

existence of a breach and for giving an appropriate remedy.' [Citations.] But '[i]f … a supposed "contract" does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract.' [Citation]." (*Id.* at p. 209.)

We use the words "material" and "essential" interchangeably. (See Black's Law Dict. (11th ed. 2019) p. 1170, col. 1.) A "material term" is defined as a "contractual provision dealing with a significant issue such as subject matter, *price*, *payment*, quantity, quality, duration, or the work to be done." (*Id*. at p. 1772, col. 2, italics added.) "Whether a term is 'essential' depends on its relative importance to the parties and whether its absence would make enforcing the remainder of the contract unfair to either party." (*Copeland v. Baskin Robbins U.S.A*. (2002) 96 Cal.App.4th 1251, 1256, fn. 3, citing *Coleman Engineering Co. v. North American Aviation, Inc*. (1966) 65 Cal.2d 396, 417, and *City of Los Angeles v. Superior Court* (1959) 51 Cal.2d 423, 433.) "When, however, 'a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable.'" (*Coleman Engineering Co*., at p. 417.)

Under the WIIN Act, "all contracts" that convert a water service contract to a repayment contract "shall … [¶] … provide for the repayment, either in lump sum or by accelerated prepayment, of the remaining construction costs identified in water project specific irrigation rate repayment schedules, as adjusted to reflect payment not reflected in such schedules, and properly assignable for ultimate return by the contractor, or if made in approximately equal installments, no later than 3 years after the effective date of the repayment contract, such amount to be discounted by 1/2 the Treasury rate." (WIIN Act, § 4011(a)(2)(A).) Westlands submits the amount to be repaid was nonnegotiable. By all indications, the amount to be repaid by Westlands was an essential term of the agreement.

In its opening brief, Westlands likens the capital repayment obligation to "the principal amount of a mortgage." The analogy undercuts its position on the question of materiality. "Typically, a contract involving a loan must include the identity of the lender and borrower, the amount of the loan, and the terms for repayment in order to be sufficiently definite." (*Daniels v. Select Portfolio Servicing*, *Inc*. (2016) 246 Cal.App.4th 1150, 1174, disapproved on other grounds in *Sheen v. Wells Fargo Bank*, *N.A.* (2022) 12 Cal.5th 905, 948, fn. 12; accord, *Peterson Development Co. v. Torrey Pines Bank* (1991) 233 Cal.App.3d 103, 115 ["The material terms of a loan include the identity of the lender and borrower, the amount of the loan, and the terms for repayment"].)

The record suggests Westlands' Board was not especially concerned about the amount of the repayment obligation, provided it was less than $362 million—an estimate nowhere stated in the contract or the Board's October 2019 resolution approving the same. The Board's prior assumptions regarding the amount do not mean the amount itself was not a material term. There is no indication Westlands was willing to agree to pay *any* amount, e.g., a higher amount. Nor does it appear the Bureau was willing to agree to anything less than a certain amount.

Citing the contractual definition of "Existing Capital Obligation," Westlands argues it was sufficient for the draft agreement to "expressly set forth how the calculations in Exhibit D would be made." We are not persuaded. The cited text of the draft reads as follows:

> "'Existing Capital Obligation' shall mean the remaining amount of construction costs or other capitalized costs allocable to the Contractor as described in section 4011, subsections (a)(2)(A) and (a)(3)(A) of the WIIN Act, and as identified in the Central Valley Project Irrigation Water Rates and/or Municipal and Industrial Water Rates, respectively, dated Month/Day/Year **[specify ratebook year for all contractors.] [contractor specific to address the intertie],** as adjusted to reflect payments not reflected in such schedule. The Contracting Officer has computed the Existing Capital Obligation and such amount is set forth in Exhibit D,

which is incorporated herein by reference." (Boldface and bracketed notations in original.)

The term "Repayment Obligation" was defined as "the Existing Capital Obligation discounted by 1/2 of the Treasury rate, which shall be the amount due and payable to the United States, pursuant to section 4011(a)(2)(A) of the WIIN Act." Elsewhere in the draft, it said the Repayment Obligation "*has been computed* … and is set forth as a lump sum payment (M&I and Irrigation) and as four (4) approximately equal annual installments (Irrigation Only) to be repaid no later than three (3) years after the effective date of this Contract as set forth in Exhibit D." (Italics added.) The same paragraph discussed timing of repayment and notice requirements for selecting the lump sum or installment option, but those provisions contained what respondents call "placeholder references," i.e., bracketed comments about future insertions, instead of the applicable dates.

To summarize, the "Repayment Obligation" cannot be determined without knowing the "Existing Capital Obligation" and/or the contents of exhibit D. The "Existing Capital Obligation" cannot be determined without knowing the contents of exhibit D. In the absence of exhibit D, both terms are useless for purposes of determining Westlands' financial obligations, i.e., "the scope of the duty and the limits of performance." (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 770.)

Moreover, as Westlands admitted during the motion proceedings, exhibit D was not merely omitted from the draft attached to the complaint. Despite being expressly incorporated into the contract by reference, exhibit D *did not exist* when the complaint and the December 2019 motion were filed. Even when the motion was heard, there was only meager parol evidence of estimates ranging from $200 million to $362 million. Given the circumstances, we agree the contract presented for validation was missing an essential term and therefore uncertain, i.e., not sufficiently definite to be binding and enforceable.

Westlands alleges that "[u]nder California law, a water supply contract that leaves the determination of the amount to be paid by the contractor to a government agency responsible for building and operating the water project is sufficiently definite to be enforceable." The cited authority is *Metropolitan Water Dist. v. Marquardt* (1963) 59 Cal.2d 159 (*Marquardt*). As we explain, the relevant holding of *Marquardt* is not so broad. The opinion is also distinguishable.

The *Marquardt* case was "a proceeding in mandamus to compel James J. Marquardt, the executive secretary of the Metropolitan Water District of Southern California, to take certain procedural steps necessary to carry out a contract for the delivery of water from the facilities of the State Water Resources Development System to the district. The contract was made … between the district and the State of California, acting through its Department of Water Resources, pursuant to the California Water Resources Development Bond Act (Wat. Code, § 12930 et seq.) [(Bond Act)]." (*Marquardt*, *supra*, 59 Cal.2d at p. 170.) The first part of the opinion addresses the constitutionality of the Bond Act. (*Marquardt*, at pp. 171–178.) The second part resolves 17 different claims regarding the validity of the contract. (*Id*. at pp. 178–202.)

Westlands cites to pages 195–197 of *Marquardt*, which discuss how the contract provided for "repayment of the costs of the entire project by means of the charges to be paid by [multiple] contractors." (*Marquardt*, *supra*, 59 Cal.2d at p. 195.) "It contain[ed] an elaborate system for the determination of the share that each contractor [would] contribute, and as part of this determination certain cost allocations [needed to] be made." (*Ibid*.) There was a claim the contract was "uncertain," but the opinion implies the dispute was not over the costs being unknown, but rather the ability to identify the necessary decisionmaker. "It [was] contended that some of these allocations, provided for in article 22(e) [of the contract], require[d] the evaluation of imponderables on a subjective basis (i.e., involving personal opinion and discretion) and that the contract [did] not provide who [would] make the subjective evaluations." (59 Cal.2d at p. 195.)

36.

After providing a case-specific analysis, the *Marquardt* opinion says, "The contract considered as a whole leaves no doubt that the allocations must be made by the state." (*Marquardt*, *supra*, 59 Cal.2d at p. 196.) The relevant holding follows: "It was not improper to leave the making of the subjective allocations to the discretion of the state. A contract may provide that conclusive factual determinations may be made by the government or its officers, and such determinations will be enforced in the absence of bad faith." (*Ibid*.)

There is no dispute over the Bureau's contractual authority to calculate Westlands' repayment obligation. The issue is whether the contract was sufficiently definite, and thus enforceable, despite its failure to identify the amount of the obligation. And whereas *Marquardt* dealt with discrete subcomponents of "an elaborate system for the determination" of cost allocations (*Marquardt*, *supra*, 59 Cal.2d at p. 195), Westlands' repayment obligation—purported to be a nine-figure sum—was the sine qua non of the "repayment contract." We do not read *Marquardt* to suggest a public agency may obtain a judgment confirming the validity of a contract, the primary focus of which is the accelerated repayment of a multimillion dollar debt, when the contract does not state the amount owed and/or the amount to be repaid. "'It is axiomatic, of course, that a decision does not stand for a proposition not considered by the court.'" (*Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 332.)

Westlands also relies on *Marquardt* to argue the contract "would have been enforceable even if in its final form it nowhere stated the amount of the repayment obligation, and instead provided the amount would be determined later by [the Bureau]." Regardless of whether *Marquardt* would support this assertion (a question we do not reach), those are not the facts of the case. The contract presented to the superior court in October 2019 said the repayment amount "has been computed … and is … set forth in Exhibit D." As the case progressed, it was revealed the repayment amount had not been computed and exhibit D did not exist.

Westlands' reliance on Water Code section 35406, which allowed its Board to delegate authority to execute contracts on its behalf, is similarly misplaced. The 2019 draft version reviewed and approved by the Board, and presented to the superior court for validation, was missing terms regarding Westlands' repayment obligations. Regardless of whether its president was authorized to execute the WIIN Act contract in February 2020, the fact remains that the earlier contract Westlands sought to validate was materially deficient. Even assuming the draft somehow reflected an understanding that the repayment amount would be determined and agreed upon at a later date, the December 2019 motion was properly denied. "The general rule is that if an 'essential element' of a promise is reserved for the future agreement of both parties, the promise gives rise to no legal obligation until such future agreement is made." (*Coleman Engineering Co. v. North American Aviation, Inc.*, *supra*, 65 Cal.2d at p. 405; accord, *Patel v. Liebermensch* (2008) 45 Cal.4th 344, 352.)

In its reply brief, Westlands cites *Starr v. City and County of San Francisco* (1977) 72 Cal.App.3d 164 (*Starr*) for the proposition "that a contract whose terms are not finalized may be validated." Westlands further contends *Starr* "establishes that an incomplete contract—indeed one containing merely an 'agreement to agree'—can be the proper subject of a validation proceeding …." The Counties' attorney refuted these contentions at oral argument, correctly observing that none of the contracts at issue in *Starr* were found to be, or even suggested to be, materially incomplete.

The procedural history of *Starr* included two prior validation actions concerning a redevelopment plan adopted by the Board of Supervisors for the City and County of San Francisco (City). In the first validation action, the legality of the original plan was upheld on appeal. "The plan was subsequently amended by ordinance in 1971 and 1973," including "an ordinance approving and authorizing the execution of a financing agreement between the City and [the San Francisco Redevelopment Agency (Agency)]." (*Starr*, *supra*, 72 Cal.App.3d at p. 168.)

38.

The financing agreement in *Starr* required the Agency to execute a project lease between itself and the City, and it "also provided that at a future date the City and the Agency would enter into a 'repayment agreement' under which the Agency would provide for the use of tax allocation funds to offset lease payments owed by the City." (*Starr*, *supra*, 72 Cal.App.3d at pp. 168–169.) The Agency filed a validation action "seeking an in rem validation of the ordinance authorizing execution of the financing agreement," and this second validation action was resolved by a settlement agreement. The terms of the settlement required certain changes to the redevelopment plan and a reduction of "the maximum amount of bonds to be issued by the Agency [to finance the project] from $225 million to $210 million." (*Id*. at p. 169.)

Following the adoption of ordinances authorizing the City to enter into the project lease and execute the repayment contract, a group of taxpayer plaintiffs challenged the legality of both agreements. In this third validation action, the *Starr* court determined the project lease was valid but concluded the repayment contract violated the debt limitation provision of article XVI, section 18 of the California Constitution. (*Starr*, *supra*, 72 Cal.App.3d at pp. 170–177.) The unlawful clause of the repayment contract would have required the City to repay, on a date years in the future, whatever outstanding debt the Agency may have owed at that time to the United States Department of Housing and Urban Development (HUD). (*Id*. at pp. 169–170.)

Westlands purports to rely on the *Starr* court's rejection of a res judicata argument made by the City on appeal. The City had argued the judgment in the second validation action, which confirmed the validity of the financing agreement, barred subsequent legal challenges to other contracts related to that agreement, i.e., the project lease and the repayment contract. However, the HUD clause was found to be "so new and materially different" from what was contemplated by the financing agreement "that the issue of the City's violation of the constitutional debt limitation could not possibly have been adjudicated [in the second validation action]." (*Starr*, *supra*, 72 Cal.App.3d at p. 178.)

39.

Accordingly, *Starr* holds "the doctrine of res judicata does not apply where there are changed conditions and new facts which were not in existence at the time of the prior judgment, and upon which such judgment was based." (*Id*. at pp. 178–179.) Westlands' attempt to draw some type of strained analogy between *Starr* and the present case is entirely unavailing.

### B.      September 2021 Motion Ruling

Westlands' September 2021 motion was made pursuant to Code of Civil Procedure section 1008, subdivision (b). The statute provides: "A party who originally made an application for an order which was refused in whole or part… may make a subsequent application for the same order upon new or different facts, circumstances, or law, in which case it shall be shown by affidavit what application was made before, when and to what judge, what order or decisions were made, and what new or different facts, circumstances, or law are claimed to be shown…." (*Ibid*.)

As Westlands acknowledges, the standard of review is abuse of discretion. (*California Correctional Peace Officers Assn. v. Virga* (2010) 181 Cal.App.4th 30, 42.) "Although precise definition is difficult, it is generally accepted that the appropriate test of abuse of discretion is whether or not the trial court exceeded the bounds of reason, all of the circumstances before it being considered." (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598.) This deferential standard is often difficult to satisfy. "'The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.'" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)

"A party renews a motion by 'mak[ing] a subsequent application for the *same order* [based on] new or different facts, circumstances, or law.' [Citation.] Both the original and renewed motions must request 'identical relief.'" (*Doe v. Westmont College*

(2021) 60 Cal.App.5th 753, 761.) In *Westmont College*, the prevailing plaintiff filed a motion for $58,466 in attorney fees, which the trial court denied. The defendant appealed the judgment, and the plaintiff again prevailed in the appellate court. The plaintiff later filed a second motion for attorney fees with the trial court, this time seeking $85,652, which was also denied. The plaintiff appealed, and the second motion was held to not constitute a "renewed motion" under Code of Civil Procedure section 1008 because the two motions did not seek identical relief. (*Westmont College*, at p. 761; cf. *California Correctional Peace Officers Assn. v. Virga*, *supra*, 181 Cal.App.4th at pp. 42–43 [second attorney fees motion, despite being based on different statutory grounds for recovery, qualified as renewed motion under Code Civ. Proc., § 1008 because movants "sought the identical amount in their second motion"].)

Here, the issue boils down to whether Westlands sought to validate the same contract in the December 2019 and September 2021 motions. Respondents have steadily maintained that the contract presented for validation in late 2019 was materially different from the WIIN Act contract executed in February 2020. We agree.

The contract approved by Westlands' Board in October 2019 differs from the February 2020 WIIN Act contract in several respects. First, the 2019 version had an effective date of March 1, 2020. The effective date of the WIIN Act contract is June 1, 2020. Under the WIIN Act, the effective date is important for reasons including establishment of the deadline for the contractor's performance of the repayment obligation. (WIIN Act, § 4011(a)(2)(A).) Other deadlines set forth in both versions of the contract are also tied to the effective date. More importantly, according to Westlands' own evidence, the effective date has a direct impact on the calculation of the repayment amount. Therefore, although the repayment amount of the 2019 contract remains unknown, it was necessarily different from the repayment amount of the WIIN Act contract. It follows that the effective date is a material term.

41.

Second, the WIIN Act contract adds subdivision (k) to Article 7 ("Rates, Method of Payment for Water and Accelerated Repayment of Facilities"), thereby inserting more than a page of new content regarding the "Tiered Pricing Component."[12] Some references to the Tiered Pricing Component in the 2019 contract are deleted from the WIIN Act contract, and many more references are added to the WIIN Act contract throughout 72 numbered pages of the document. Westlands claimed this was done "to avoid any ambiguity," and its appellate briefing argues the edits do not constitute "a substantive change." Regardless of whether the changes are "material," they are more than trivial revisions to the earlier draft.

Third, the inclusion of exhibits A, B, C, and D in the WIIN Act contract constitute significant, material changes to the 2019 contract. Exhibit A is a map of Westlands' service area; exhibit B is a schedule of the rates and charges per acre-foot of water delivered for the year 2020; exhibit C is an eight-page document explaining the purpose and methodology of the Bureau's "[w]ater needs assessments … performed for each CVP water contractor eligible to participate in the CVP long-term contract renewal process"; and exhibit D pertains to the amount of Westlands' repayment obligation. For the reasons previously explained, the amount to be repaid is a material term.

Given the material differences between the October 2019 contract and the February 2020 WIIN Act contract, the superior court did not abuse its discretion by denying the September 2021 motion. The September 2021 motion sought to validate a different contract than the one attached to Westlands' complaint and its December 2019 motion. Therefore, what was labeled as a renewed motion in September 2021 did not actually seek the "same order" as requested in December 2019. (Code Civ. Proc., § 1008,

---

[12]The "Tiered Pricing Component" is defined in the 2019 contract as "the incremental amount to be paid for each acre-foot of Water Delivered as provided for in Exhibit B." It is defined in the WIIN Act contract as "the incremental amount to be paid for each acre-foot of Water Delivered as described in Article 7 of this Contract and as provided for in Exhibit B."

subd. (b); see *Doe v. Westmont College*, *supra*, 60 Cal.App.5th at p. 761; *California Correctional Peace Officers Assn. v. Virga*, *supra*, 181 Cal.App.4th at p. 43 ["""The nature of a motion is determined by the nature of the relief sought, not by the label attached to it"""].)

As a final observation, we note Westlands' repayment obligation under the WIIN Act contract is still unclear to this court even with the materials filed in support of the September 2021 motion. Westlands proffered two versions of exhibit D, both pertaining to multiple contractors and multiple contracts. Westlands claims to have paid the Bureau a lump sum of $209,436,667 in June 2020. We are unable to reconcile this figure with the calculations in either version of exhibit D.

The first version of exhibit D, attached to resolution No. 110-21, contains one page specifically concerning "Westlands Water District" and the WIIN Act Contract (contract No. 14-06-200-0495A-IR1-P). The lump sum calculation is $535,596. The other page of the exhibit facially pertains to "Westlands Water District DD #1" and references four contracts, one of which is the WIIN Act contract. On this page the lump sum calculation is $208,182,333, and there is an adjusted "M&I Construction Cost" of $264,913. Setting aside the confusing references to a different contractor and three other contracts, the amount Westlands claims to have paid to satisfy its repayment obligation—$209,436,667—is higher than the sums on both pages combined. Added together, the lump sum calculations and the M&I Construction Cost only come out to $208,982,842.

The second version of exhibit D, attached to the fourth declaration of Jose Gutierrez, also consists of two pages. The first page again identifies the contractor as "Westlands Water District DD #1," but whereas the other version references four different contracts, this version references six contracts (one of which is the WIIN Act Contract). The lump sum calculation is $204,635,193 and the adjusted M&I Construction Cost is $264,913, which together total $204,900,106. The second page, which exclusively refers to "Westlands Water District" and the WIIN Act contract,

43.

calculates a lump sum obligation of $519,163. But even when the figures on both pages are combined, the sum ($205,419,269) is millions of dollars *less* than the amount Westlands claims to have paid to satisfy its repayment obligation under the contract ($209,436,667).

## DISPOSITION

The judgment is affirmed. All parties shall bear their own costs on appeal.


                                                    PEÑA, Acting P. J.

WE CONCUR:


SMITH, J.


SNAUFFER, J.


44.